# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 4, 2008 Session

## ARTHUR CREECH ET AL. v. ROBERT R. ADDINGTON ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Sevier County**
**No. 97-16-II     Richard R. Vance, Judge**

---

**No. E2006-01911-SC-R11-CV - Filed March 31, 2009**

---

The eleven Plaintiffs, investors in a real estate development in Tunica, Mississippi, suffered losses when the financing for hotels on the tracts of land they had leased failed to materialize. Five of the Plaintiffs first learned of the investment opportunity in 1993 while attending a presentation by real estate agents Lloyd and Betty Link in Gatlinburg. After suit was filed against several Defendants based upon breach of oral and written contracts, the trial court entered an order of dismissal as to the Links and other of the Defendants and, later, granted a motion for summary judgment in favor of D.C. Parker and Richard Flowers, the owners of the land. When judgments had been entered as to all of the Defendants, the Plaintiffs appealed, but only as to Parker and Flowers. The Court of Appeals reversed, holding that whether an agency relationship existed between Parker and Flowers, as principals, and the Links, and whether the Links had been guilty of misrepresentation were disputed questions of fact. Upon remand, a jury found that the Links were the agents of Parker and Flowers, who were vicariously liable for fraudulent misrepresentations made by the Links. Damages were awarded to the Plaintiffs. In a second appeal, this time by Parker and Flowers, the Court of Appeals affirmed as to those five Plaintiffs who had attended the presentation in Gatlinburg, but remanded for a new trial as to those who did not. We granted an application for permission to appeal to consider whether the order of dismissal in favor of the agents precluded any adjudication of vicarious liability as to the principals.

We find that the order of dismissal in regard to the Links has become final, was on the merits, and involves the same cause of action as the pending fraudulent misrepresentation claims. The doctrine of res judicata applies. Because the Plaintiffs' right of action against the agents has been extinguished by operation of law, the Plaintiffs are not entitled to a judgment against Parker and Flowers based solely upon the fraudulent misrepresentations by the Links as agents. Moreover, the Plaintiffs did not properly preserve for appeal their claims of direct liability against Parker and Flowers. The judgment of the Court of Appeals is, therefore, reversed, the jury's verdict assigning vicarious liability to Parker and Flowers is vacated, and the case is dismissed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed,**
**Judgment of the Trial Court Vacated and Case Dismissed**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., WILLIAM M. BARKER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Rick L. Powers and Dan D. Rhea, Knoxville, Tennessee, for the appellants, D.C. Parker and Richard Flowers.

David H. Parton, Gatlinburg, Tennessee for the appellees, Arthur Creech et al.

**OPINION**

**Factual Background**

This litigation has a long and complicated history. The eleven claimants (the "Plaintiffs") include Arthur and Glenda Creech, Darlene Reinier, Vicki Sue Jacobs, Joann Wolfe, Claude and Deborah Hatfield, Wayne and Alice Martin, and Brent and Marvin Chitwood, Jr., the latter two of whom were doing business as Triad Partners.[1] Years ago, each of the Plaintiffs invested in an ill-fated real estate development in Tunica, Mississippi known as Mhoon Landing.

On October 18, 1993, five of the Plaintiffs (the Creeches, Reinier, Jacobs and Wolfe) attended a presentation at the Laurel Inn in Gatlinburg at the invitation of Earl Allen, the manager of the Inn. Tennessee residents Lloyd and Betty Link, the owners of Link and Associates, Inc., a real estate agency incorporated in this state, made a presentation designed to encourage those in attendance to invest in property owned by D.C. Parker and Richard Flowers, residents of Mississippi, on the Mississippi River in Tunica. Lloyd Link ("Link") informed the potential investors that casino barges, which were already in operation, had long-term leases at the Mhoon Landing site, and that there was likely to be significant development on the subject property. As a part of his presentation, Link displayed a map, which had been provided by Parker and Flowers, that identified the development plan for the property, including a golf course, sporting complex, hotels and restaurants.

Link proposed to sell five-acre parcels of property for the development of hotels. He informed the five prospective investors that GE Capital Modular Space ("GE Capital"),[2] through its agents Robert R. Addington, John O. Freeman and Consolidated Technologies Corporation ("Consolidated Technologies"),[3] had already guaranteed financing for the hotels, and that construction would begin immediately if those in attendance agreed to participate. While Link never

---

[1] The Plaintiffs Jacobs, Wolfe, the Hatfields and the Martins were residents of Ohio. The Creeches were from North Carolina, the Chitwoods from South Carolina, and Reinier from Tennessee. Triad Partners was incorporated in South Carolina.

[2] GE Capital Modular Space was the assumed name for Transport International Pool, Inc. ("Transport International"), a Pennsylvania corporation doing business in Tennessee.

[3] Addington was a resident of Kentucky and Freeman was a resident of Alabama. Consolidated Technologies was incorporated in Kentucky.

2

explicitly identified himself to the five Plaintiffs present as either an "agent" or "representative" for Parker and Flowers, he did state that all purchases of the property had to be made through his agency and claimed that the funds were required at the earliest possible date. Heightening the sense of urgency, an individual who identified himself as Mr. Frost interrupted the meeting, announcing that he was interested in purchasing the property if the other individuals present passed on the opportunity. Link's asking price was $250,000, or $50,000 per acre. When it became apparent that those in attendance could not afford that price, Link offered twenty-year leases on the Parker and Flowers lands for the pre-paid amount of $125,000, or $25,000 per acre.

At the conclusion of the presentation, Arthur Creech, on behalf of Laurel Group, Inc., agreed to lease one tract and Reinier, Jacobs and Wolfe, on behalf of Golden Girls, Inc., agreed to lease a second tract.[4] While they executed identical forms styled "Contract for Sale of Commercial Real Estate," it is uncontested that the two documents actually were lease transactions for twenty-year terms. Both Laurel Group and Golden Girls made down payments of $25,000 with Link and Associates, who, according to the contracts, served as the "Escrow agent" for Parker and Flowers. Although Parker and Flowers were listed as the sellers on the contracts, they never signed the documents, and they claimed not to have seen them until after this litigation commenced.

The six remaining Plaintiffs, the Hatfields, the Martins and the Chitwoods, did not attend the October 1993 meeting in Gatlinburg. Brent Chitwood and Claude Hatfield had learned of the Mhoon Landing development previously – Chitwood through meetings with both Link and Allen, and Hatfield through discussions with Allen. Wayne Martin learned of the investment opportunity through Hatfield. Both Hatfield and Martin invested in the property in the name of the Laurel Group, as did the Chitwoods, through Triad Partners. One of the documents shown to Chitwood when he was considering the proposal was a May 5, 1993 press release written by Ellis Darby, who was the financial manager for Parker's companies and who also assisted Parker and Flowers in the Mhoon Landing development. This document, titled "Mhoon Landing Announces Casino Line-up," touted five casino openings for the fall of 1993 and provided that "[d]evelopers R.B. Flowers and D.C. Parker ha[d] arranged long term leases with each casino operator for sites containing at least twenty acres." The document went on to describe the plans to develop infrastructure, lodging and recreational facilities on the property. The Chitwoods and the other Plaintiffs testified that in electing to invest in the leases, they relied in great measure upon the validity of the long-term commitment of the casinos to maintain their location on the adjoining area.

In November of 1993, the Plaintiffs Reinier, Jacobs, Wolfe, Claude Hatfield and Wayne Martin all traveled to Tunica to see the Mhoon Landing development firsthand. While in Mississippi, they met with both Flowers and Darby, who informed them of the progress of the development. The investors were shown the "very impressive" riverfront casinos and understood from their conversations that the structures were "not going anywhere anytime soon." Link, who had his own trailer on the site, made a presentation to the group regarding the development plan and

---

[4] Allen later filed articles of incorporation in Mississippi for both Laurel Group and Golden Girls and served as the President of both corporations. Both corporations eventually were administratively dissolved.

identified the parcels set aside for the Plaintiffs' hotels. Because of the booming activity at the casinos and the potential for extensive development, all of the Plaintiffs in attendance expressed satisfaction with the plans for their properties.

The leases were closed in Tunica on December 8, 1993. Hatfield, Martin and the Defendant Allen,[5] an officer in the corporations, attended on behalf of Laurel Group and Golden Girls. Flowers, his attorney Nancy Arnold, Darby and the Links participated in the closing on behalf of the lessors. Allen, Flowers and Arnold signed the leases, which had an initial term of twenty years and a clause under which either party could terminate if the Plaintiffs failed to construct hotels on their tracts within the first six months. Both Laurel Group and Golden Girls pre-paid rent in the amount of $125,000 for their leases, and Parker and Flowers acknowledged receipt. Parker and Flowers, however, actually received pre-paid rentals of only $100,000 for each parcel of land. The Links received the balance, a total of $50,000, pursuant to a prior contract between Parker and Flowers and Link, under which Link was entitled to any amount in excess of $100,000 for a five-acre parcel. At the closing, Link provided another report on the progress of the development. Afterwards, when Hatfield asked whether the financing for the hotels was still in place, Link offered assurances that the loan for hotel construction was guaranteed as to each of the leased parcels.

As it turned out, however, the construction financing from GE Capital never materialized. An attempt to secure financing from another source was also unsuccessful. Further, although the casino barges had indeed entered into long-term leases to remain docked at the Mhoon Landing site, those leases included an "escape clause" permitting the casinos to terminate and relocate with thirty-days notice. Not long after the Plaintiffs closed on the leased property, the casinos did precisely that. None of the Plaintiffs were aware of the escape clause in the casinos' lease agreement with Parker and Flowers. They complained that they would not have invested in the property had they known of the right of termination. When Laurel Group and Golden Girls failed to construct hotels, Parker and Flowers terminated the leases without offering refunds of the rentals.

**Procedural History**

In January of 1997, the Plaintiffs filed a complaint against Addington, Freeman, Consolidated Technologies, GE Capital, Transport International, Parker, Flowers, Allen, Link and Associates, and the Links in their personal capacities (the "Defendants"). The Plaintiffs alleged breach of oral and written contracts for the failure to finance the construction of the two hotels at Mhoon Landing, as well as breach of fiduciary duty and the intentional infliction of emotional distress. The lawsuit sought both compensatory damages and punitive damages in the amount of $35 million. Significantly, the complaint did not contain allegations of fraudulent misrepresentations by any of the Defendants.

Over the next several months, the individual Defendants filed their responses to the

_____

[5] There is no indication that Allen, the manager of the Laurel Inn and a Defendant in this litigation, invested in the Mhoon Landing leases. He was acquainted with several of the Plaintiffs prior to the transaction and assisted in the organization of their corporations.

complaint. In March of 1997, the Links and Link and Associates filed an answer, generally denying the Plaintiffs' allegations and asserting affirmative defenses; in their response, the Links contended that they only were acting as agents for the disclosed principles (GE Capital and Parker and Flowers) and that they had no personal liability because they "never at any time acted outside the source and scope of their authority." Parker and Flowers also filed an answer, denying any agency relationship with the Links and claiming that they were not subject to the jurisdiction of the Tennessee court.

In June of 1997, GE Capital and Transport International filed a motion to dismiss on the grounds that the Plaintiffs' claims failed to satisfy the statute of frauds;[6] they argued that the statute barred the suit because the Plaintiffs could not produce "a copy of a written instrument [signed by the party bound] evidencing the alleged commitment to lend money or to extend credit." The Links and Link and Associates joined in the motion to dismiss on the same grounds. The Plaintiffs responded that all of the Defendants were estopped from using the statute of frauds as a defense because the Plaintiffs had detrimentally relied on the Defendants' representations that financing for the hotels was in place. They also filed a motion for leave to amend their complaint to this effect, attaching additional documents to support their claims. After a hearing in January of 1998, the trial court entered judgment on February 4, 1998, granting the Plaintiffs' motion for leave to amend their complaint but dismissing all claims against GE Capital, Transport International, and the Links based upon the protections under the statute of frauds.[7]

The Defendants Addington, Freeman and Consolidated Technologies filed motions for summary judgment. At a hearing in December of 2000, however, the trial court denied relief, holding that material facts were in dispute regarding whether those Defendants were aware that the Links were acting as their agents and had solicited prospective investors based upon assurances of financing.[8] At the same hearing, the trial court found that "a different set of circumstances" existed as to Parker and Flowers, because there was "no evidence that Parker and Flowers misrepresented anything with respect to the GE financing." The trial court further observed that "Parker and Flowers had really nothing to do with the financing." Because the representations regarding whether

---

[6] Tennessee's statute of frauds states, in relevant part:

> No action shall be brought against a lender or creditor upon any promise or commitment to lend money or to extend credit, or upon any promise or commitment to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor.

Tenn. Code Ann. § 29-2-101(b)(1) (Supp. 2008).

[7] The Plaintiffs amended the complaint again in February 2000 for the sole purpose of changing the corporate name of Consolidated Technologies.

[8] In February of 2001, Addington, Freeman and Consolidated Technologies announced that they had reached a settlement agreement with the Plaintiffs.

financing was already in place were "central to the theories of [P]laintiffs," and because there were no disputed material facts concerning whether Parker and Flowers made such misrepresentations, the trial court granted their motion for summary judgment in an order filed January 4, 2001.

On January 2, 2003, the Plaintiffs settled with the Defendant Earl Allen, the Laurel Inn manager, and the trial court, describing Allen as "the last remaining Defendant in this case," entered "a final judgment as to all causes of action." With a final judgment in place, the Plaintiffs filed a timely notice of appeal of the order granting summary judgment to Parker and Flowers but chose not to appeal as to the Links or their real estate agency.[9] After review, the Court of Appeals reversed, holding that the trial court had erred by failing to "address Plaintiffs' claim that the Links were [Parker and Flowers'] agents and that [those] Defendants were liable for their agents' misrepresentations." Creech v. Addington, No. E2003-00842-COA-R3-CV, 2004 WL 34505, at *4 (Tenn. Ct. App. Jan. 7, 2004) ("Creech I").[10] Because "[t]he question of whether the Links were acting as Defendants' agents [was] a disputed question of fact," id., the Court of Appeals ruled that summary judgment was not appropriate.

In March of 2004, after the reversal and remand for trial by the Court of Appeals, Parker and Flowers filed another motion for summary judgment. They contended that the Plaintiffs' claims against them based upon any misrepresentations by the Links as their agents should be dismissed, notwithstanding the opinion of the Court of Appeals, because of the earlier dismissal of the suit against the Links, a disposition which had become final. Parker and Flowers argued that the dismissal of the Links from the breach of contract lawsuit had the effect of barring any claims against them as principals based solely on vicarious liability. The trial court denied Parker and Flowers' motion for summary judgment, holding that "a factual resolution of the question of the Links' alleged agency for these defendants was required before the res judicata issue could be resolved." During their preparations for trial, the Plaintiffs, having gained additional information by way of depositions, filed yet another amendment to the complaint in October of 2005. For the first time, the Plaintiffs filed pleadings specifically alleging fraudulent misrepresentations on the part of Parker, Flowers and the Links. The Plaintiffs claimed that "but for their reliance upon such misrepresentations," they would never have invested in the Mhoon Landing development. In their answer to the amended complaint, Parker and Flowers pled the affirmative defense of agent exoneration by res judicata. They argued that the final judgment dismissing the Links on the breach of contract claim released them, as principals, from all vicarious liability claims that might have arisen from the agency relationship.

---

[9] The Plaintiffs did not appeal any other part of the judgment.

[10] The Court of Appeals wrote further that "[i]f the Links were acting as Defendants' agents, and Plaintiffs were induced to lease the land by fraudulent misrepresentations made by the Links as Defendants' agents, then Defendants potentially could be liable for those misrepresentations." Creech I, 2004 WL 343505, at *4. Our review of the record reveals that the operative complaint at the time of this appeal contained only general allegations regarding misrepresentations by all Defendants pled to estop certain Defendants from using the statute of frauds as a defense. As discussed infra, the complaint was not amended to add claims of fraudulent misrepresentations by the Links until 2005.

6

During the course of the trial, several of the Plaintiffs testified, as did Parker, Flowers, and Parker's employee, Darby. The Links did not appear as witnesses. At the conclusion of the trial, the jury entered a special verdict, in which it found that (1) the Links were the agents of Parker and Flowers when they made their presentation in Gatlinburg on October 18, 1993; (2) the Links intentionally made false statements of fact for the purpose of misleading one or more of the Plaintiffs to rely upon their statements to their detriment at the October 1993 presentation; and (3) one or more of the Plaintiffs relied upon the false statements of the Links to their detriment. The jury awarded compensatory damages to the eleven Plaintiffs in the total amount of $505,000, as follows:

| Plaintiff | Amount |
| --- | --- |
| Reinier | $ 85,000 |
| Jacobs | $ 85,000 |
| Wolfe | $ 85,000 |
| Creech | $ 67,500 |
| Chitwood d/b/a Triad Partners | $ 87,500 |
| Hatfield | $ 47,500 |
| Martin | $ 47,500 |
| Total | $505,000 |

The jury found that the Plaintiffs were not entitled to punitive damages. The trial court denied subsequent motions by Parker and Flowers to alter and amend the judgment and for a new trial.

The Court of Appeals affirmed in part and reversed in part, holding that because the res judicata doctrine did not extinguish a right of action against the Links based upon fraudulent misrepresentation, Parker and Flowers were not shielded from vicarious liability for the Links' misrepresentations; however, because the jury's special verdict form addressed solely whether the Links made fraudulent misrepresentations at the October 1993 presentation in Gatlinburg, only the Plaintiffs who attended the presentation (Reinier, Jacobs and Wolfe, in the amount of $85,000 each, and the Creeches, in the amount of $67,500) were entitled to favorable judgments. Creech v. Addington, No. E2006-01911-COA-R3-CV, 2007 WL 2437966, at *6-7 (Tenn. Ct. App. Aug. 29, 2007) ("Creech II").[11] The Court of Appeals remanded the remaining claims for a new trial for the purpose of addressing whether misrepresentations were directly or indirectly communicated to those Plaintiffs not in attendance in October 1993 – the Hatfields, the Martins and the Chitwoods doing business as Triad Partners. Id. at *7, *9. We granted Parker and Flowers' application for permissive appeal to determine whether principles of res judicata prevent them from being held vicariously liable to any of the eleven Plaintiffs based upon fraudulent misrepresentations by the Links as their agents.

---

[11] The Court of Appeals' assessment in Creech II as to when fraudulent misrepresentation claims were actually pled matches ours; that is, the claims were not added to the complaint until the 2005 amendment. Creech II, 2007 WL 2437966, at *5 ("The issue of misrepresentation arose when the [Plaintiffs] amended their Complaint to add fraudulent misrepresentation in October 2005.").

7

**Standard of Review**

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn R. App. P. 13(d); Whaley v. Perkins, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 704 (Tenn. 2000) (citing Crabtree Masonry Co. v. C & R Constr., Inc., 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." Barnes, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. Crabtree Masonry Co., 575 S.W.2d at 5. As to issues involving questions of law, however, our standard of review is de novo with no presumption of correctness or deference to the legal conclusions made by the lower courts. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008); S. Constructors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001).

**Analysis**

Parker and Flowers claim that they cannot be held liable for the fraudulent misrepresentations of their agents, the Links, by virtue of the final order dismissing the Links from the lawsuit on February 4, 1998. Our analysis requires consideration of the scope of the doctrine of "agent exoneration" in relation to the vicarious liability of principals as set forth in Johnson v. LeBonheur Children's Medical Center, 74 S.W.3d 338 (Tenn. 2002). This, in turn, implicates two venerable tenets of claim preclusion: res judicata and the "law of the case" doctrine. Finally, we must consider whether any claims for direct liability against Parker and Flowers have survived, necessitating further proceedings.

**I. "Agent Exoneration" from Vicarious Liability**

Parker and Flowers' primary contention in this appeal is that because the complaint against their agents had already been dismissed, they, as principals, cannot be held vicariously liable for any fraudulent misrepresentations by their agents. They argue that they cannot be held liable under the doctrine of respondeat superior because their agents have already been absolved from liability by a prior, favorable and final adjudication.

When an agency relationship has been established, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency. Boren ex rel. Boren v. Weeks, 251 S.W.3d 426, 432 (Tenn. 2008); White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000). The law does not require that the principal either expressly direct or have knowledge of the agent's tortious act; rather, it is enough that the agent was acting in the business of his superior. White, 33 S.W.3d at 724.

Here, the jury returned a special verdict establishing the relationship between Parker and Flowers, as principals, and the Links, as their agents. The verdict also established that the Links

8

made false and misleading statements upon which at least some of the Plaintiffs detrimentally relied. As to this appeal, Parker and Flowers do not challenge the existence of their agency relationship with the Links. In fact, they concede the point as a basis for their argument.

A principal's vicarious liability for the tortious acts of his agent is not without limitation. It is well-established, for example, that vicarious liability for the principal is extinguished when the agent himself is exonerated for the actions giving rise to the liability. See D.B. Loveman Co. v. Bayless, 160 S.W. 841, 843 (Tenn. 1913) ("If the immediate actor is free from responsibility . . . can his employer[--]one taking no direct part in the transaction[--]be held responsible? . . . The question carries its own answer . . . ." (quoting New Orleans & N.-E. R.R. Co. v. Jopes, 142 U.S. 18, 27 (1891))); Restatement (Second) of Judgments § 51(1) (1982). We most recently considered this issue in Johnson v. LeBonheur Children's Medical Center, which involved a claim against a hospital for the negligence of two resident physicians who were employed by the University of Tennessee through a training program. Johnson, 74 S.W.3d at 341. The hospital asserted that it could not be held vicariously liable because the physicians, as state employees, were immune from personal liability for negligent acts under Tennessee Code Annotated section 9-8-307. Id. at 342.

In Johnson, this Court, after conducting an analysis of prior case law, concluded that a principal could not be held vicariously liable for the acts of an agent in three instances. Initially, "when an action is filed against an employer based solely upon the tortious actions of its employee under the doctrine of respondeat superior, a verdict in favor of the employee entitles the employer to a discharge from liability." Id. at 344 (citing Bayless, 160 S.W. at 842). Secondly, a defendant, as the owner of a vehicle, could not be held liable to his daughter-in-law for his son's negligent operation of the vehicle; because the marital unity rule extinguished the daughter-in-law's right of action against her husband, the defendant father-in-law could not be held vicariously liable under the doctrine of respondeat superior. Raines v. Mercer, 55 S.W.2d 263, 264 (Tenn. 1932). Finally, when a plaintiff has executed a covenant not to sue the driver of a vehicle, the plaintiff cannot then bring a suit for negligence against the employer of the driver based solely upon vicarious liability. Stewart v. Craig, 344 S.W.2d 761, 763 (Tenn. 1961). Combining the holdings of these three cases, this Court set forth the following rule of law:

> [A] principal may not be held vicariously liable under the doctrine of respondeat superior based upon the acts of its agent in three instances: (1) when the agent has been exonerated by an adjudication of non-liability, (2) when the right of action against the agent is extinguished by operation of law, or (3) when the injured party extinguishes the agent's liability by conferring an affirmative, substantive right upon the agent that precludes assessment of liability against the agent.

Johnson, 74 S.W.3d at 345. We ultimately held in Johnson that the plaintiff could maintain her action against the hospital because, unlike the marital unity rule, the statute conferring immunity did not extinguish a claimant's right of action against the State of Tennessee by operation of law, but merely immunized the physicians in residence at the hospital from individual monetary liability. Id. at 345-46.

We have described the categories established in Johnson to be exhaustive, setting forth the only three instances in which a principal may not be held vicariously liable for his agent's tortious acts under the doctrine of respondeat superior. Shelburne v. Frontier Health, 126 S.W.3d 838, 844 (Tenn. 2003). In consequence, unless Parker and Flowers fall within one of the protected categories, they may be held vicariously liable to the Plaintiffs based upon the fraudulent misrepresentations of the Links. Because the third of the three categories – that the Plaintiffs conferred an affirmative right on the Links precluding any assessment of liability – does not apply, the dispositive question is either whether the Links were exonerated by an adjudication of non-liability or whether the Plaintiffs' right of action against the Links was extinguished by operation of law.

Parker and Flowers argue that the Links' dismissal from the lawsuit in February 1998 was "an adjudication of non-liability." We disagree. When the trial judge considered the motion to dismiss filed by GE Capital and Transport International, in which the Links and Link and Associates joined, the Plaintiffs' claim was founded upon breach of contract. The Plaintiffs had alleged that the Defendants had, either orally or in writing, promised financing for the development, construction and operation of hotels to be located on Parker and Flowers' property. The trial judge found that none of the writings presented by the Plaintiffs rose to the level "of a contract wherein there is a meeting of the minds." Because "there was no written agreement [or] written contract between these parties" as to financing, the trial judge concluded that the statute of frauds required dismissal of the breach of contract suit.

While "totally dismiss[ing] the Links from the lawsuit" because they had "joined in the Motion to Dismiss along with the GE Companies and based again upon the Statute of Frauds," the trial court did not make a finding or holding regarding fraud on the part of the Links. The trial court limited its ruling to the scope of the documents signed in October of 1993 in Gatlinburg, and indicated that any allegations of fraud or misrepresentation would be related to the lease agreements that closed several weeks later in a separate jurisdiction. The trial court, therefore, made no judgment as to the allegations of fraudulent misrepresentation that form the basis of the litigation between the Plaintiffs and Parker and Flowers today. In consequence, there has been no determination of liability or non-liability of the Links as to the fraudulent misrepresentation issue. Cf. Rankhorn v. Sealtest Foods, 479 S.W.2d 649, 652 (Tenn. Ct. App. 1971).

Indeed, the Plaintiffs insist that they did not become aware of the Links' fraudulent misrepresentations regarding the financing until taking the depositions of Parker and Flowers in September of 2000, some two-and-a-half years after the Links were dismissed from the lawsuit. The Plaintiffs did not amend their complaint to include these allegations until November of 2005. The trial court's holding that the Plaintiffs failed to state a breach of contract claim against the Links upon which relief could be granted is not "an adjudication of non-liability" that would absolve Parker and Flowers from vicarious liability for any fraudulent misrepresentations by the Links.[12] As

---

[12] Recently, the Court of Appeals applied the first Johnson factor where summary judgment had been granted in favor of the employee doctor, thus freeing an employer hospital from vicarious liability. Grigsby v. Univ. of Tenn. Med. Ctr., No. E2005-01099-COA-R3-CV, 2006 WL 408053, at *5 (Tenn. Ct. App. Feb. 22, 2006). In Grigsby,

10

such, this case does not fall within the first <u>Johnson</u> category.

A more difficult question is whether the Plaintiffs are able to pursue their suit for vicarious liability against Parker and Flowers based upon the second category identified in <u>Johnson</u>, that their right of action against the Links has been "extinguished by operation of law." The phrase "operation of law" is defined as "[t]he means by which a right or a liability is created for a party regardless of the party's actual intent." Black's Law Dictionary 1119 (7th ed. 1999); <u>see also</u> <u>Ward v. Doss</u>, 205 S.W.3d 767, 771 (Ark. 2005) (accepting definition of "[t]he term operation of law . . . as the manner in which rights [. . .] devolve upon a person by the mere application [. . .] of the established rules of law, without the act or co-operation of the party himself" (quoting <u>Kaplus v. First Cont'l Corp.</u>, 711 So.2d 108, 111 (Fla. Dist. Ct. App. 1998))). <u>Johnson</u> and most of the cases that have interpreted and applied the second category of its "agent exoneration" rule have done so only in the statutory context, considering either specific provisions intended to confer immunity on an agent or the expiration of a statute of repose.[13] <u>See</u> <u>Johnson</u>, 74 S.W.3d at 345-46; <u>Shelburne</u>, 126 S.W.3d at 845; <u>Huber v. Marlow</u>, No. E20007-01879-COA-R9-CV, 2008 WL 2199827, at *3-4 (Tenn. Ct. App. May 28, 2008); <u>Logan v. Everett</u>, No. M2005-00012-COA-R3-CV, 2006 WL 223708, at *8 (Tenn. Ct. App. Jan. 27, 2006).

Supreme courts in other states have at least intimated that the doctrines of res judicata and collateral estoppel also serve to bar relitigation of a suit or issue "by operation of law." <u>See, e.g.</u>, <u>Huff v. Huff</u>, 648 S.W.2d 286, 288 (Tex. 1983) (holding that claim for child support merged into final divorce judgment "is precluded from further relitigation by operation of the law of res judicata"); <u>Lundeen v. Hackbarth</u>, 171 N.W.2d 87, 89 (Minn. 1969) (declining to apply collateral estoppel "because it would work a manifest injustice" of "turn[ing a] traffic light from green to red by operation of law"). Whether res judicata serves to extinguish a right of action "by operation of law" for purposes of the <u>Johnson</u> rule, however, is a question of first impression for this Court.

To illustrate the second category of agent exoneration, <u>Johnson</u> discussed this Court's opinion in <u>Raines</u>, which applied the common-law doctrine of interspousal tort immunity.[14] Although res judicata is very different, nothing in our ruling in <u>Johnson</u> placed limitations on the term "operation of law." Res judicata, much like the marital unity doctrine or a statute of repose, may serve as a complete bar to relitigation, thus extinguishing the right of action against the same defendant, regardless of the merits of the claim. If, therefore, the 1998 order of dismissal bars any

---

however, the summary judgment was granted as to the very allegations – negligence and medical malpractice – upon which the plaintiff based his vicarious liability claim against the hospital. <u>Id.</u> at *1, *3-4. Such is not the case here.

[13] In one case, the Court of Appeals invoked the second category in <u>Johnson</u> to bar a breach of contract suit alleging vicarious liability of a principal due to "principles of agency law"; specifically, the right of action against the agent was "extinguished by operation of law because [the agent] was acting as the agent of a disclosed principal." <u>Patton v. Estate of Upchurch</u>, 242 S.W.3d 781, 792 (Tenn. Ct. App. 2007), <u>perm. to app. denied</u> (Tenn. 2008).

[14] As noted in <u>Johnson</u>, 74 S.W.3d at 345 n.2, the marital unity rule extinguishing antenuptial actions for tort between spouses was abolished in Tennessee many years after the Court decided <u>Raines</u>. <u>See</u> <u>Davis v. Davis</u>, 657 S.W.2d 753, 759 (Tenn. 1983).

11

future action by the Plaintiffs against the Links under the doctrine of res judicata, then the Plaintiffs' right of action has been "extinguished by operation of law." By the principles confirmed in Johnson, res judicata, as an operation of law, would preclude an action against Parker and Flowers based solely upon the fraudulent misrepresentations by their agents.

## II. Res Judicata

Our inquiry into whether the Plaintiffs' right of action against the Links was extinguished by "operation of law" requires careful consideration of the 1998 order of dismissal. The doctrine of res judicata, also referred to as claim preclusion, bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. Massengill v. Scott, 738 S.W.2d 629, 631 (Tenn. 1987); see also Barnett v. Milan Seating Sys., 215 S.W.3d 828, 834-35 (Tenn. 2007). The primary purposes of the doctrine are to promote finality in litigation, prevent inconsistent or contradictory judgments, conserve legal resources, and protect litigants from the cost and vexation of multiple lawsuits. Sweatt v. Tenn. Dep't of Corr., 88 S.W.3d 567, 570 (Tenn. Ct. App. 2002); see also Moulton v. Ford Motor Co., 533 S.W.2d 295, 296 (Tenn. 1976) ("[R]es judicata is not based upon any presumption that the final judgment was right or just. Rather, it is justifiable on the broad grounds of public policy which requires an eventual end to litigation."); Jordan v. Johns, 79 S.W.2d 798, 802 (Tenn. 1935) ("[P]ublic policy dictates that litigation should be determined with reasonable expedition, and not protracted through inattention and lack of diligence on the part of litigants or their counsel.").[15]

The "same parties or their privies" requirement for application of res judicata is met here; that the Plaintiffs and the Links were both a part of the original proceeding is not contested. For the judgment dismissing the Links to serve as res judicata and potentially implicate the second category of the agent exoneration doctrine of Johnson, we must, therefore, conclude that the judgment (1) was final, (2) was on the merits, and (3) involved the same cause of action.

## A. Final Judgment

A judgment is final in Tennessee "when it decides and disposes of the *whole* merits of the

---

[15] The public policy supporting res judicata and its companion doctrine of collateral estoppel, or issue preclusion, has a long history in our state, even preceding the adoption of our 1870 Constitution. While holding that the jury's disposition of an issue during prior litigation between the parties barred the consideration of that issue in a subsequent suit between them, Justice Robert Looney Caruthers wrote as follows:

> It is not material . . . whether the finding of the jury was right or not in the former suit. That cannot be questioned any more between the same parties or their privies. Right or wrong the question was finally closed, unless a new trial had been obtained in the same suit. This rule is not alone for the benefit of the parties litigant, to put an end to strife and contention between them, and produce certainty as to individual rights, but it is also intended to give dignity and respect to judicial proceedings, and relieve society from the expense and annoyance of interminable litigation about the same matter.

Warwick v. Underwood, 40 Tenn. (3 Head) 238, 241 (1859).

case leaving nothing for the further judgment of the court." Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 460 (Tenn. 1995) (quoting Saunders v. Metro. Gov't of Nashville & Davidson County, 383 S.W.2d 28, 31 (Tenn. 1964)). In the absence of an express direction of the court to the contrary, a judgment that disposes of only some of the claims, issues, or parties is not a final judgment and is subject to revision by the court at any time before the entry of a final judgment adjudicating all claims and the rights and liabilities of all parties. Tenn. R. Civ. P. 54.02; see also Tenn. R. App. P. 3(a) (stating that such a judgment is not enforceable or appealable); Stidham v. Fickle Heirs, 643 S.W.2d 324, 328 (Tenn. 1982). As a general rule, a trial court's judgment becomes final thirty days after its entry unless a party files a timely notice of appeal or specified post-trial motion. State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996); see Tenn. R. App. P. 4(a)-(c).

While the Court of Appeals acknowledged that res judicata extends to any matters material to the disposition of a case that the litigants might have brought forth by the exercise of reasonable diligence, Creech II, 2007 WL 2437966, at *5 (citing Collins v. Greene County Bank, 916 S.W.2d 941, 946 (Tenn. Ct. App. 1995)), it found that "[t]he trial court's order dismissing the Links from the suit was not subject to the . . . doctrine, because it was not final," in that the claims against the remaining defendants had not been adjudicated. Id. at *6. We agree that the 1998 order dismissing the Links was not final at the time of its entry because the Plaintiffs still had claims pending against other defendants, including Parker and Flowers. On January 2, 2003, however, the trial court dismissed the complaint against Earl Allen, the last remaining defendant in the case. On that date, the trial court entered "a final judgment as to all causes of action pending in this Court, Orders of Compromise and Dismissal or Summary Judgment having been previously entered with respect to all other Defendants in this action." The Plaintiffs filed a timely notice of appeal, but only as to the summary judgment granted in favor of Parker and Flowers on January 4, 2001. Once the thirty-day period for filing a notice of appeal expired on February 1, 2003, the judgments as to all of the other Defendants, including the Links, became final and non-appealable.[16]

The rule in Tennessee may well be that a "judgment is not final and *res judicata* where an appeal is pending."[17] McBurney v. Aldrich, 816 S.W.2d 30, 34 (Tenn. Ct. App. 1991); see also Freeman v. Marco Transp. Co., 27 S.W.3d 909, 913 (Tenn. 2000). As stated, however, the Plaintiffs only appealed the January 2, 2003 judgment as to two of the Defendants: Parker and Flowers. In

---

[16]Appropriately, in 2004 the Court of Appeals vacated and remanded only the judgment as to Parker and Flowers. Creech I, 2004 WL 34505, at *5.

[17] We note that this general rule places Tennessee in the minority of jurisdictions. The federal courts and the majority of states have found "[t]he better view," Restatement (Second) of Judgments § 13 cmt. f, to be that taking of an appeal does not affect the finality of a judgment for res judicata purposes. See Deposit Bank of Frankfort v. Bd. of Councilmen, 191 U.S. 499, 514 (1903); Smith v. SEC, 129 F.3d 356, 362 n.7 (6th Cir. 1997); Campbell v. Lake Hallowell Homeowners Ass'n, 852 A.2d 1029, 1039-40 (Md. Ct. Spec. App. 2004) (citing jurisdictions following the majority and minority view and adopting Restatement approach).

13

our view, the judgments as to the rest of the defendants are final.[18]

## B. Judgment on the Merits

Next, we consider whether the trial court's February 4, 1998 order dismissing the Links from the breach of contract suit, which became final on February 1, 2003, was a judgment on the merits. See Goeke v. Woods, 777 S.W.2d 347, 349 (Tenn. 1989). In Tennessee, any dismissal of a claim other than a dismissal for lack of jurisdiction, for lack of venue, or for lack of an indispensable party "operates as an adjudication upon the merits," unless the trial court specifies otherwise in its order for dismissal. Tenn. R. Civ. P. 41.02(3). Guided by this rule, the Court of Appeals has held that an order granting a motion to dismiss for failure to state a claim upon which relief can be granted under Tennessee Rule of Civil Procedure 12.02(6) is an adjudication on the merits. Boyd v. Prime Focus, Inc., 83 S.W.3d 761, 766 (Tenn. Ct. App. 2001), perm. to app. denied (Tenn. 2002). We agree with that assessment. Unlike the dismissal of a complaint on procedural or technical grounds, "[t]he sole purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss is to test the legal sufficiency of the complaint." Dobbs v. Guenther, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992) (citing Sanders v. Vinson, 558 S.W.2d 838, 840 (Tenn. 1977); Holloway v. Putnam County, 534 S.W.2d 292, 296 (Tenn. 1976)). The trial court's judgment granting the Rule 12.02(6) motion to dismiss brought by GE Capital, Transport International, the Links and Link and Associates was, therefore a judgment on the merits for res judicata purposes.

## C. Same Cause of Action

Finally, we must determine whether the breach of contract suit dismissed in February of 1998 and the amended complaint alleging vicarious liability on the part of Parker and Flowers for the false and misleading statements of the Links qualify as the same cause of action. "Jurists have found it difficult to give a proper definition" to the term "cause of action." Black's Law Dictionary 214 (7th ed. 1999) (quoting Edwin E. Bryant, The Law of Pleading Under the Codes of Civil Procedure 170 (2d ed. 1899)).[19] Before we can answer the question posed to us by these circumstances, our task is to clearly define the term "cause of action" for res judicata purposes.

The Court of Appeals has ruled that "[t]he principal test for determining whether the causes of action are the same is whether the primary right and duty or wrong are the same in each case." Gerber v. Holcomb, 219 S.W.3d 914, 918 (Tenn. Ct. App. 2006) (quoting Hutcheson v. TVA, 604 F. Supp. 543, 550 (M.D. Tenn. 1985)). This "primary right" standard for defining cause of action

---

[18] Because the judgment dismissing the Links did not become final until February 1, 2003, the Plaintiffs' argument that Parker and Flowers waived agent exoneration and res judicata by failing to plead the doctrines as affirmative defenses has no merit. All affirmative defenses must be set forth "[i]n pleading to a preceding pleading." Tenn. R. Civ. P. 8.03. The only pleading that the Plaintiffs filed after February 1, 2003 was their amended complaint in October of 2005. Parker and Flowers' answer to that amendment does allege res judicata and exoneration from vicarious liability based upon the dismissal of the Links from the lawsuit.

[19] See also City of Tahlequah v. Lake Region Elec., Coop., Inc., 47 P.3d 467, 472-73 (Okla. 2002) (observing that the authors of the Federal Rules of Civil Procedure discontinued the use of the term "cause of action" in favor of new term "claim" "[b]ecause the substantive legal meaning of this troublesome phrase . . . came to be enveloped in controversy"); 46 Am. Jur. 2d Judgments § 530 (1994) (discussing different meanings of "cause of action").

appears to be similar to one commonly attributed to Professor John Norton Pomeroy and followed in other jurisdictions as well, most notably California.[20] See, e.g., Gamble v. Gen. Foods Corp., 280 Cal. Rptr. 457, 460 (Cal. Ct. App. 1991) ("[A] cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. Thus, two actions constitute a single cause of action if they both affect the same primary right." (citation omitted)).

As the Defendants have observed, the Court of Appeals has reached inconsistent results by the application of the "primary right" test. On one hand, our Court of Appeals has held that a suit for rescission and revocation of acceptance and a suit for breach of warranties were different causes of action, even where they arose out of the same transaction, because the set of facts needed to prove each of the claims were sufficiently different. Phillips v. Gen. Motors Corp., 669 S.W.2d 665, 668 (Tenn. Ct. App. 1984), perm. to app. denied (Tenn. 1984). On the other hand, the Court of Appeals has held that a tort action followed by a suit to enforce a settlement contract qualified as the same cause of action, because the purpose of both suits was to compensate the plaintiffs for the same underlying wrong; that is, their injuries from an automobile accident. Patton, 242 S.W.3d at 790-91. In Patton, the Eastern Section stressed that "[a] plaintiff may not, by disclaiming or failing to present a particular fact or theory, preserve such fact or theory to be used as a ground for a second suit." Id. (quoting Barnett, 215 S.W.3d at 835). Parker and Flowers, citing Patton, contend that the claim for breach of contract and the subsequent claim of fraudulent misrepresentation constitute the same cause of action because they seek to remedy the same primary wrong; that is, the Plaintiffs' losses from their investment in the Mhoon Landing development.

Parker and Flowers also suggest that this Court eschew the "primary right" approach for determining whether the "cause of action" is the same in favor of the broader standard espoused by the Second Restatement. That test, also known as the "transactional" standard, provides as follows:

> When a valid and final judgment rendered in an action extinguishes the plaintiff's claim . . ., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

Restatement (Second) of Judgments § 24(1). Under the Restatement standard, "the concept of a transaction is . . . used in the broad sense," and "connotes a natural grouping or common nucleus of

---

[20] See John Norton Pomeroy, Code Remedies: Remedies and Remedial Rights § 347 (4th ed. 1904) ("[T]he primary right and duty and the delict or wrong combined constitute the cause of action . . . ."). See also O.L. McCaskill, Actions and Causes of Action, 34 Yale L.J. 614, 638 (1925) (defining cause of action as "that group of operative facts which, standing alone, would show a single right in the plaintiff and a single delict to that right giving cause for the state, through its courts, to afford relief to the party or parties whose right was invaded").

operative facts."[21]  Id. § 24 cmt. b.  Although the Restatement makes clear that "[t]he expression 'transaction, or series of connected transactions,' . . . invokes a pragmatic standard to be applied with attention to the facts of the cases," id., the drafters' explicit efforts to respond to "modern procedural ideas," id. cmt. a, indicate that "transaction" for res judicata purposes is intended to be analogous to the phrase "transaction or occurrence" as used in the Federal Rules of Civil Procedure.  See, e.g., Fed. R. Civ. P. 13(a)(1) (determining whether counterclaims are compulsory); Fed. R. Civ. P. 15(c)(1)(B) (determining whether an amendment to a pleading relates back to the date of the original pleading).[22]  Of course, Tennessee's procedural rules match the federal rules in this regard.  See Tenn. R. Civ. P. 13.01; Tenn. R. Civ. P. 15.03.

Over the past quarter-century, the majority of the federal courts and numerous states have adopted the transactional standard for determining whether a prior judgment and a pending suit are the same cause of action for purposes of applying res judicata.[23]  See, e.g., Nilsen v. City of Moss Point, 701 F.2d 556, 560 n.4 (5th Cir. 1983); Beegan v. Schmidt, 451 A.2d 642, 645-47 (Me. 1982); see also J.Z.G. Res., Inc. v. Shelby Ins. Co., 84 F.3d 211, 215 (6th Cir. 1996) (using the standard of section 24 of the Restatement (Second) in the application of "federal principles of res judicata").  We are persuaded by the reasoning of those courts.  The transactional standard best advances res judicata and the goals of the doctrine:  namely, the finality of litigation, consistency and stability of judgments, judicial efficiency and the conservation of resources of both the courts and litigants.  We concur with the drafters of the Restatement that the modern system of procedure, in which the transactional approach is grounded,

---

[21] The transactional approach evolved out of a proposed definition of "cause of action" set forth by Professor Charles E. Clark in his seminal article on the topic.  Professor Clark proposed that "cause of action" be defined as "the group of operative facts giving cause or ground for judicial interference."  Charles E. Clark, The Code Cause of Action, 33 Yale L.J. 817, 828 (1924).  Clark criticized Pomeroy's "primary right" standard, noting that "it seems to be precise, and yet upon application in practice it does not carry any exact meaning which will afford any practical test for the problem to which it should afford the solution."  Id. at 826; see also Anthony J. Bellia Jr., Article III and the Cause of Action, 89 Iowa L. Rev. 777, 796 (2004).

[22] See Bellia, 89 Iowa L.R. at 797 (positing that the transactional standard for cause of action "prevailed" with the adoption of the Federal Rules of Civil Procedure, because "[t]he transactional standards governing joinder, pleading amendments, and res judicata that subsequently developed reflected Clark's conception of the cause of action").

[23] For a more thorough list of courts adopting the transactional test, see 18 Charles Alan Wright et al., Federal Practice & Procedure § 4407 nn.22 & 44 and accompanying text (Westlaw 2009).  Federal courts have occasionally expressed frustration in diversity cases where states have failed to adopt the transactional test for cause of action:

The fact that we must apply Illinois state law, rather than federal law, to this issue is of critical importance. . . .  Though we are bound to apply it, the Court believes this cause clearly shows that the Illinois rule is inadequate in upholding the policy behind the doctrine of res judicata. . . .  Because of crowded dockets, it is difficult for courts to give litigants the one day in court they deserve.  The Plaintiff in this cause insists on having three.  Thus, we press on in the hope that Illinois courts will eventually see fit to follow the current trend among state courts to follow the approach of the Restatement (Second) of Judgments § 24 in dealing with res judicata questions.

Salaymeh v. St. Vincent Mem'l Hosp. Corp., 706 F. Supp. 643, 646-47 (C.D. Ill. 1989).

allows allegations to be made in general form and reads them indulgently; it allows allegations to be mutually inconsistent subject to the pleader's duty to be truthful. It permits considerable freedom of amendment and is willing to tolerate changes of direction in the course of litigation. . . . [Under the transactional approach, t]he law of res judicata now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.

Restatement (Second) of Judgments § 24 cmt. a. Two suits, therefore, shall be deemed the same "cause of action" for purposes of res judicata where they arise out of the same transaction or a series of connected transactions.

The transactional approach, while more predictable and easier to apply than the "primary right" test, is not without limitations. In defining the scope of res judicata, this Court has long been careful to balance the doctrine's benefits of efficient proceedings and finality and consistency of judgments with the dangers of unduly limiting the rights of litigants to have all of their claims heard on merits. In White v. White, 876 S.W.2d 837 (Tenn. 1994), the plaintiff brought a suit to establish that her insured spouse, who had disappeared while on a business trip years earlier, died prior to the date that his life insurance policy lapsed. The defendants, the insurance company and a bank with an assignment interest in the policy, argued that her suit was barred by res judicata because a jury had determined in an earlier proceeding that the fact of the insured's death had not been established by a preponderance of the evidence. Id. at 838-39. The Court concluded that the second suit was not barred because "neither the issue to be decided, nor the evidence to be considered, [was] the same as in the previous case." Id. at 841. Chief Justice Reid, on behalf of a unanimous Court, wrote that

[a] judgment or decree is res judicata only as to the matters in issue; the adjudication, to be conclusive, should be upon the very point brought directly in issue by the pleadings; and a party will not be prejudiced by a judgment as to rights not then accrued.

Id. at 839. The Court further noted that

[w]here the matter, which gave rise to the plaintiff's cause of action sought to be declared, arose after the termination of a former suit in which a judgment was rendered and which judgment, it was sought, to interpose as res adjudicata, the defense of a former judgment under these circumstances can not prevail.

Id. at 840 (quoting 2 Walter H. Anderson, Actions for Declaratory Judgment § 460 (2d ed. 1951)). The doctrine of res judicata "extends only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a re-examination of the same question between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of the litigants." Banks v. Banks, 77 S.W.2d 74, 76 (Tenn. Ct. App. 1934) (quoting 34 C.J. 905, § 1313), cert. denied (Tenn. 1934).

Although the policy reasons for adopting the transactional definition of cause of action are universal, the equitable concerns expressed in White and Banks demonstrate that the standard should be applied on a case-by-case basis, with sensitivity to the facts of each proceeding. There are a number of circumstances in which a second action by a plaintiff against the same defendant might be necessary and appropriate even though the second suit arises out of the same transaction or series of connected transactions as the first suit. See Restatement (Second) of Judgments § 26(1). Like many of the other states adopting the transactional approach,[24] we observe that even where two claims arise out of the same transaction, the second suit is not barred by res judicata unless the plaintiffs had the opportunity in the first suit to fully and fairly litigate the particular issue giving rise to the second suit. For example, when a plaintiff is initially unaware of the existence of a cause of action due to the defendants' own concealment or misrepresentation, whether fraudulent or innocent, a second cause of action is appropriate. Restatement (Second) of Judgments § 26 cmt. j. "The result is different, however, where the failure of the plaintiff to include the entire claim in the original action was due to a mistake, not caused by the defendant's fraud or innocent misrepresentation." Id.

By the application of these guidelines to the case at bar, our assessment is that the breach of contract claim against GE Capital, Consolidated Technologies and the Links is the same cause of action as that against Parker and Flowers based solely upon the false and misleading representations of the Links. The claims arise out of the same transaction or series of transactions in regard to the failed Mhoon Landing development project. Moreover, the concerns that this Court expressed in White and Banks are not applicable here, because the new facts that might have altered the Plaintiffs' rights against the Defendants came to light while the suit against the Links was still pending. The record establishes that the Plaintiffs had the opportunity to fully and fairly litigate the fraudulent misrepresentation claims against the Links before the finality of the judgment.

In September of 2000, the Plaintiffs discovered during the depositions of Parker, Flowers, and their employee Darby that one or more of the Links' statements at the October 1993 meeting in Gatlinburg was false and misleading. As stated, the 1998 order of dismissal did not become final until after February 1, 2003, thirty days after the trial court adjudicated the claims, rights and liabilities of all parties in the litigation. Over two years elapsed between the discovery of the fraudulent misrepresentations and the finality of the judgment. During this time, the Plaintiffs were free to amend their complaint to allege fraudulent misrepresentation as an alternate theory of recovery against the Links.[25] They also could have filed a notice of appeal as to the dismissal of the

---

[24] See, e.g., Sotavento Corp. v. Coastal Pallet Corp., 927 A.2d 351, 357-58 (Conn. App. Ct. 2007) (declining to apply res judicata because claims in second suit "involve different operative facts, which demonstrates that the plaintiff did not have an adequate opportunity to litigate the matter in the earlier proceeding").

[25] The earlier dismissal of the Links from the lawsuit did not serve as the "law of the case" preventing the Plaintiffs from pleading alternative claims against the Links under a fraudulent misrepresentation theory between September 2000 and January 2003. Cf. Hawkins v. Hart, 86 S.W.3d 522 (Tenn. Ct. App. 2001). In Hawkins, the Court of Appeals held that "it was not an abuse of discretion for the trial court to refuse to allow [a new] claim against a defendant already dismissed from the action" because it would have forced that defendant "to fight a new battle that could have been fought several years earlier." Id. at 533. The Plaintiffs here, however, did not obtain the facts giving rise to their fraudulent misrepresentation claims against the Links until after the Links were dismissed.

18

Links from the lawsuit after the trial court entered final judgment, just as they appealed the grant of summary judgment in favor of Parker and Flowers. They did neither. Because the fraudulent misrepresentation claims arise out of the same transaction or series of transactions as the unsuccessful breach of contract suit, and all of the claims in the current suit were brought or could have been brought in the prior suit, the two suits qualify as the same cause of action for res judicata purposes.

The January 2, 2003 judgment of the trial court, which included the dismissal of the Links from the lawsuit in February 1998, is final as to all parties but Parker and Flowers, is on the merits, and involves the same cause of action as the remaining claims that are still pending. As such, res judicata bars an action against Parker and Flowers based solely upon the Links' fraudulent misrepresentations. The right of action against the Links, having been "extinguished by operation of law" under the rationale set forth in Johnson v. LeBonheur Children's Medical Center, the Plaintiffs may not proceed on a claim of vicarious liability against the Links' principals, Parker and Flowers.[26]

### III. "Law of the Case" Doctrine

In order to fully address all of the Plaintiffs' claims, we also address the "law of the case" doctrine, one closely related to res judicata. "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept." Arizona v. California, 460 U.S. 605, 618 (1983). The scope of the law of the case doctrine in Tennessee has been clearly established:

> [U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted); see also Hawkins, 86 S.W.3d at 531.

Res judicata and the law of the case doctrine have distinct and important differences. "Law of the case directs a court's discretion, it does not limit the tribunal's power." Arizona v. California, 460 U.S. at 618. See also Memphis Publ'g Co., 975 S.W.2d at 306 ("The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court."); State v. Scarbrough, No. E2003-02850-CCA-R9-CD, 2004 WL 2280423, at *4 (Tenn. Crim. App. Oct. 11, 2004) (quoting Brett T. Parks, McDonald's Corp. v. Hawkins and the "Law of the Case" Doctrine in Arkansas, 50 Ark. L. Rev. 127, 131 (1997) ("Res judicata differs from the law of the case in that it settles the rights of the parties once the judgment is final. The law of the case does not settle rights; it only

---

[26] Our holding, of course, bars the claims of all of the Plaintiffs, regardless of whether or not they attended the October 18, 1993 meeting at the Laurel Inn in Gatlinburg.

19

settles the law to be applied in determining the rights of the parties. Also, many courts view res judicata as a rule of law, whereas the law of the case is merely a practice to guide the court." (footnotes omitted))).

The Plaintiffs draw on language from various sections of Creech I to argue that Parker and Flowers are not entitled to the protection of the agent exoneration doctrine. In Creech I, the Court of Appeals vacated the summary judgment and remanded for a trial to determine the disputed factual question of whether the Links were acting as agents for Parker and Flowers. 2004 WL 34505, at *4-5. The court cited Johnson v. LeBonheur Children's Medical Center, 74 S.W.3d at 343, for the proposition that "[i]f the Links were acting as Defendants' agents, and Plaintiffs were induced to lease the land by fraudulent misrepresentations made by the Links as Defendants' agents, then Defendants potentially could be liable for those misrepresentations." Id. at *4. The Plaintiffs argue that the reference to Johnson, when combined with a statement in the opinion that "[t]he Links and another party were dismissed from the suit based upon the statute of frauds," id. at *2, constitutes a judgment which is now the law of the case; that is, the agent exoneration principles of Johnson do not apply.

The issue of agent exoneration, however, was not before the Court of Appeals, and the purpose of the reference to Johnson was to set out the general principles of respondeat superior, not agent exoneration. In consequence, the Court of Appeals made no determination, either actually or by implication, that would serve as the law of the case concerning whether there had been an "adjudication of non-liability" of the Links for fraudulent misrepresentations or whether the Plaintiffs' right of action against the Links had been "extinguished by operation of law." The law of the case doctrine does not disturb the effect of res judicata, which bars the Plaintiffs from pursuing their claims of vicarious liability against Parker and Flowers.

## IV. Direct Liability of Parker and Flowers

Having resolved the issue of vicarious liability, we must determine whether there remain any existing claims of direct liability against Parker and Flowers for either breach of contract or fraudulent misrepresentation.[27] When asked about the direct liability claims at oral argument, counsel for the Plaintiffs responded that the Plaintiffs "did allege direct liability of Parker and Flowers, but our judge limited what the jury could consider – I believe wrongly – to the statements made in Gatlinburg." Counsel for Parker and Flowers admitted that he "honestly can't tell" whether

---

[27] The trial court previously made findings as to Parker and Flowers' direct liability for fraudulent misrepresentation in its January 2001 order granting them summary judgment. In that order,

> [the trial court] found that there was no evidence that Defendants misrepresented anything with respect to the financing, and that Defendants simply were supplying the land to be leased. The Trial Court found that there was "no direct proof that [Defendants] made any misrepresentation to induce anyone" and further, that there was no breach of the lease.

Creech I, 2004 WL 34505, at *4. Of course, this order was vacated by Creech I.

the direct liability issues are before the Court at this time. Because the parties have not briefed the issue of Parker and Flowers' direct liability, we must review the record to determine whether the Plaintiffs raised the issue of direct liability below, and, if so, whether they did so in a timely manner. If Plaintiffs failed to either present the issue or preserve it for appeal, the cause need not be remanded to the trial court for further consideration.

In the second amended complaint, the Plaintiffs made allegations of direct liability against Parker and Flowers and also contended that Parker and Flowers were liable for the statements of Darby, Parker's employee. In paragraph 32, the Plaintiffs specifically alleged that they relied to their detriment on fraudulent misrepresentations by "the defendants and the defendant's real estate agents." At the time of the amendment, Parker and Flowers were the only remaining defendants in the litigation. During the course of trial, the Plaintiffs presented evidence that Parker, Flowers or Darby had made false and misleading statements. A press release dated May 5, 1993, stating that Parker and Flowers "have arranged long term leases with each casino operator," was submitted as Exhibit 8. Further, at least one of the Plaintiffs, Brent Chitwood, testified that the statements in the press release were false, and that he had relied upon them to his financial detriment. Darby, called by the Plaintiffs to testify as an adverse witness,[28] acknowledged that he had prepared the press release and then given it to the Links to use in marketing the Mhoon Landing development. Finally, when Plaintiff Joann Wolfe was asked about her meeting with Flowers and Darby in Tunica, she responded that "just about everything that was said [at that meeting] was false," and she then proceeded to provide specifics. The Plaintiffs did, therefore, present some evidence in support of the direct liability claim against Parker and Flowers.

Obviously, the Plaintiffs prevailed at the trial on the theory of vicarious liability. Perhaps because they considered that theory as their most viable ground for relief, the Plaintiffs did not preserve the direct liability issue for appellate purposes, despite the opportunity to do so. At the pre-trial conference on April 21, 2006, the trial court sought to outline the questions to be considered in light of the Court of Appeals' opinion in Creech I. After considerable discussion, the following exchange took place:

> THE COURT: There's a lot of things you can introduce . . . to show or prove your issues, and you may talk about contracts and talk about a lot of things, but as I understand it, the claim – the action – is not based upon breach of contract, as you've already told me, it's based upon the fraudulent misrepresentations that were made through the claimed agents. And to the extent that any statements were made directly by them, that may be – if otherwise admissible – all. I don't see where you all are – you all are talking about the same thing here.
> MR. RHEA [Counsel for the Defendants]: I think we are, but I'm just trying to figure out if there's a breach of contract claim in here or not.
> THE COURT: He says there's not.

---

[28] "When a party calls a witness determined by the court to be a hostile witness, interrogation may be by leading questions." Tenn. R. Evid. 611(c).

21

MR. PARTON [Counsel for the Plaintiffs]: The gravamen of our complaint at this point is the misrepresentation.
THE COURT: Right. He says there's not. That's why I say you all are in agreement.
MR. RHEA: So we're back to the Court of Appeals issues?
THE COURT: Basically. Basically.
MR. RHEA: And the only other question is, again, setting aside the evidentiary issues . . . . our interpretation of the claim and our interpretation of Your Honor's jurisdictional rulings from six years ago, and the Court of Appeals' opinion, is that the claim has to arise from statements or torts or misrepresentations made in the state of Tennessee.
THE COURT: Yes. We're clear on that.

(Emphasis added.)

There was no proof of any "misrepresentations made in the state of Tennessee" by Parker, Flowers or Darby. The only evidence of any misrepresentation made in this state was attributed to the Links. In context, the pre-trial conference appears to have limited the scope of the proceedings, excluding the breach of contract claims and any claims of direct liability against Parker and Flowers based upon any statements made in Tennessee. The Plaintiffs tacitly agreed that their claim was based upon misrepresentations by the Links.

That conclusion is buttressed by other developments during the course of the trial. Just prior to closing arguments, the Plaintiffs failed to lodge an objection to either the special jury verdict form or the instruction proposed by the trial court on direct liability. The special verdict form made no reference to the direct liability of either Parker or Flowers. It asked only whether the Links were the agents of Parker and Flowers when they made their presentation in Gatlinburg on October 18, 1993, whether the Links intentionally made false and misleading statements of fact upon which the Plaintiffs relied to their detriment, and what, if any, damages resulted. See Keith v. Murfreesboro Livestock Mkt., Inc., 780 S.W.2d 751, 759 (Tenn. Ct. App. 1989) ("Counsel should object promptly to a proposed verdict form. If possible, they should object to the form before its submission to the jury. However, if unaware of the form's substance, they should object before the jury returns its verdict. Failure to make a timely objection to a verdict form constitutes a waiver of the objection." (citations omitted)). Moreover, during that same discussion, the trial judge informed the parties that he intended to instruct the jury only to consider any evidence of misrepresentations on the part of Parker and Flowers as follows:

You have heard evidence of statements by Ellis Darby, Lloyd Link, D.C. Parker, and Richard Flowers and received documents made in the state of Mississippi. You may consider those statements and documents made in Mississippi only for the purpose of determining whether Mr. or Mrs. Link were the agents of the defendants in Tennessee, whether or not the defendants knew that the representations being made on their behalf in Tennessee by Mr. and Mrs. Link were false or misleading, or that the defendants ratified such alleged false or misleading representations.

22

Although it is the duty of the trial court to provide accurate instructions to the jury, the Plaintiffs, after being made aware of the limitations on the jury's consideration of the evidence prior to closing arguments, neither objected nor made a special request for any alternative directive.[29]  The Plaintiffs, therefore, waived appellate consideration of the liability of Parker and Flowers for any fraudulent misrepresentations made by them or Parker's employee, Darby, upon which the Plaintiffs may have relied.

**Conclusion**

Because res judicata bars the suit against Parker and Flowers, as principals, based solely upon the fraudulent misrepresentations of the Links, their agents, the judgment of the Court of Appeals is reversed and the jury verdict ordering Parker and Flowers to pay money damages on the theory of vicarious liability is vacated.  Because the Plaintiffs have waived any claim of direct liability on the part of Parker and Flowers, the case is dismissed.  Costs on appeal are assessed against the Plaintiffs, Arthur Creech et al., for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

---

[29] "Our trial courts have a duty to give accurate jury instructions.  Under this rule, a party may seek a new trial because of inaccuracies in the jury charge even if there is no objection at trial."  Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing Tenn. R. Civ. P. 51.02).  In this unusual instance where the Plaintiffs prevailed at trial under a theory of vicarious liability, the Plaintiffs understandably chose not to file a post-trial motion challenging the trial court's limitations on the scope of the proceedings.  As a result, the content of the special verdict form to the jury, which omitted altogether the question of direct liability, and the instruction by the trial court limiting the jury's consideration of the evidence only to the question of vicarious liability, were not specifically addressed in this appeal.  See Tenn. R. App. P. 3(a) & 36(a); Waters, 229 S.W.3d at 689-90; Alexander v. Armentrout, 24 S.W.3d 267, 273 n.9 (Tenn. 2000).

23