IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 24, 2017 Session

## IN RE BROOKE E. ET AL.

**Appeal from the Juvenile Court for Stewart County**
**No. 81JC1-2015-JT-03     Andy Brigham, Judge**

_____

**No. M2016-02370-COA-R3-PT**

_____

This is a termination of parental rights case involving an almost nine-year-old child, who was removed from his parents' custody after allegations of sexual abuse, physical abuse, and a violation of the prior visitation order. On June 26, 2015, the Stewart County Juvenile Court ("trial court") granted temporary legal custody of the child to the Tennessee Department of Children's Services ("DCS"). The child was immediately placed in foster care, where he has remained since that date. Following an adjudicatory hearing, the trial court entered an order, finding the child dependent and neglected as to both parents. The father filed a notice of appeal from the adjudicatory hearing order, which appeal was still pending during trial in this matter. On September 1, 2015, DCS filed a petition to terminate the parental rights of the father.[1] Following a bench trial, the trial court terminated the father's parental rights to the child upon the grounds that (1) prior to incarceration, the father had abandoned the child by exhibiting a wanton disregard for the child's welfare, (2) the conditions that led to the child's removal from the parents' custody persisted, and (3) he had committed severe abuse against a half-sibling of the child. The court also found clear and convincing evidence that termination of the father's parental rights was in the best interest of the child. The trial court declined to terminate the mother's parental rights after finding that said termination was not in the best interest of the child. The father has appealed. Having determined that there was not a final adjudicatory hearing order for purposes of *res judicata* due to a pending appeal, we reverse the trial court's ruling regarding the statutory ground of persistence of conditions. We conclude that the trial court erred by including in its decision portions of evidence from the adjudicatory hearing order, which was pending on appeal, but we determine this error to be harmless. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the child.

---

[1] DCS had also filed a petition to terminate the mother's parental rights, but the trial court denied that petition. The mother is not participating in this appeal. Thus, we will limit our discussion to the facts and legal analysis that are relevant to the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL
SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Elizabeth A. Fendley Hahn, Clarksville, Tennessee, for the appellant, Toby E.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant
Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural History

The Child, Steven E. ("the Child") was born in October 2007 to Toby E.
("Father") and Kelly E. ("Mother"). The matter before us involves the termination of
Father's parental rights to the Child, who was almost nine years old at the time of trial.
Although the Child's siblings were also removed from the parents' home around the
same time as the Child, this termination proceeding involves solely the Child.[2] This
action began when DCS filed a petition with the trial court on September 1, 2015,
seeking to terminate Father's and Mother's parental rights to the Child. In its petition
regarding Father, DCS alleged as statutory grounds that (1) Father had abandoned the
Child by failing to provide a suitable home for him, (2) Father had abandoned the Child
by failing to support the Child, (3) Father had abandoned the Child by engaging in
conduct exhibiting a wanton disregard for the welfare of the Child prior to Father's
incarceration, (4) Father had committed severe child abuse against a half-sibling of the
Child, and (5) the conditions leading to the Child's removal from Father's custody still
persisted. DCS further alleged that termination of Father's parental rights was in the best
interest of the Child.

Prior to trial, DCS chose not to pursue the allegation regarding the ground of
abandonment by failure to support. The trial court conducted a bench trial on October
24, 2016, during which Mother, Father, Brooke, DCS representatives, and the Child's
foster parent testified. Dr. Victor Pestrak presented testimony as an expert witness at the

---

[2] The petition also initially involved the parental rights to Brooke E., who is a half-sibling of the Child.
However, DCS nonsuited the allegation underlying the petition to terminate parental rights to Brooke E.
prior to the termination hearing at issue. Only the parental rights to the Child, Steven E., are at issue in
this appeal.

adjudicatory hearing on October 29, 2012. Dr. Pestrak's previous testimony was admitted at trial because he was deceased and, therefore, unavailable at the time of the termination trial. Father also appeared and testified during trial notwithstanding the fact that he was incarcerated at the time.

The trial testimony established that Mother and Father began living together in April 2007 with Father's three children, Brooke, Jacob, and Haley, and Mother's child, Winter. The Child was born to Mother and Father in October 2007. Mother and Father subsequently married in March 2010. After the children were removed from the parents' custody, the parents had another child, Ethan, who remained in Mother's custody. Mother and Father eventually divorced in April or May of 2014. At trial, both Mother and Father denied being together in an ongoing relationship. Father testified that his children were previously removed from his custody briefly for excessive discipline to the child, Brooke. The trial court's judgment reflects that Brooke was placed in her grandfather's custody in 2005.

According to the trial court record, Haley and Brooke had disclosed sexual abuse by Father, and Jacob and Haley had disclosed physical abuse by Father. Initially, the trial court entered a temporary restraining order prohibiting all contact between Father and the Child. Although Father's children were placed into DCS custody, Mother was permitted to retain custody of the Child and Winter. At some point, the trial court modified its initial order to allow Father to exercise four hours of therapeutic visitation with the Child each month. On May 17, 2012, the trial court removed the Child from Mother's custody and placed him into DCS custody. According to Mother, the Child was removed from her custody after Father came onto the premises where she and the Child were residing, violating the trial court's visitation order.

The trial court conducted an adjudicatory hearing on October 29, 2012, and subsequently entered an order on January 4, 2013, finding, *inter alia*, that Haley, Brooke, Jacob, Winter, and the Child were dependent and neglected and that Haley and Brooke had been severely abused by both Father and Mother. The dispositional hearing order, entered in March 2013, provided that it was in the Child's best interest to remain in DCS custody and that DCS was relieved of its statutory duty to provide reasonable efforts to reunite Father with the Child. The adjudicatory and dispositional hearing orders were appealed by Father to the Stewart County Circuit Court, and that appeal was still pending at the time of the hearing concerning the termination of parental rights petition.

At trial, Mother testified that Father had been emotionally and verbally abusive to her since 2007 and that his behaviors had later escalated to physical abuse. Mother described an incident that occurred shortly before the children were removed from the parents' custody when Father was physically abusive to her. According to Mother, Father grabbed her by the neck, causing her to fall to the floor. Mother testified that she

told Father to "get off of [her]" but that he squeezed tighter and "told [her] to shut the f*** up." Mother explained that Father became angry when she informed him that she would take the Child and leave. Father responded by saying, "he would dump [her] in the well out back and nobody would ever know." It is undisputed that both Haley and Brooke were present at the time of this altercation. Brooke attempted to intervene to pull Father off Mother. According to Father, Mother was threatening to take the Child away from him when he lost control of his temper and placed his hands around Mother's neck for "a split second." Brooke noted that she observed an incident when Father was on top of Mother and choking her.

Mother further related that Father arrived at their home in December 2011, saw her packed bag, and became angry. She observed Father entering the home to retrieve a gun and heard him mention something about ending his life. According to Mother, Father thereafter "headed down the street with a gun." Father testified that he had lost everything and did not deny that he left his home with a weapon and proceeded in the direction of the home of Latisha H., who is the mother of Brooke, Haley, and Jacob. Father further stated, "I was going to blow her head off."

Mother also testified regarding an incident that occurred in May 2014, after the Child was placed into DCS custody, resulting in Father's arrest for domestic assault against Mother. According to Mother's account of the event, as Father followed her in his truck while she was driving from his home, he nearly caused her to crash into his vehicle. Mother explained that Father "sped in front of [her], spun out, [and] hit the guardrail," forcing Mother to "slam on [her] brakes to keep from hitting him." Mother then returned Ethan to Father's home so that Father could tell him goodbye. Once they arrived, Father opened the car door and removed the keys from the ignition of Mother's vehicle. According to Mother, Father also grabbed her cellular telephone and broke it by throwing it upon the ground, informing Mother that she was not leaving until they "talked." Consequently, Mother ran to a neighbor's home and contacted law enforcement.

Father recounted the incident differently. According to Father, despite Mother's agreeing to talk, she decided to go out with friends while Father kept Ethan. During the ensuing argument, Mother left. Father then entered his truck and "flashed her down." When Mother informed Father that she had been dating another man, Father instructed her to bring Ethan back to his house, which she did. Father stated that he reached into Mother's open car door to grab her cellular telephone and keys, and that Mother ran toward him. Father confirmed that he broke the cellular telephone but stated that it was his phone that was broken, not Mother's, because he had given Mother a cellular telephone to use. According to Father, he cautioned Mother not to contact law enforcement, warning her that DCS would become involved with Ethan. While Father

4

instructed Mother to take Ethan and leave, she ran to the neighbor's home and called law enforcement. Father acknowledged that he was subsequently arrested.

Additionally, Mother testified regarding a later incident in July 2014 when Father pinned her against her vehicle so that she could not move. Mother reported that she "laid on the horn" to get the children's paternal grandfather's attention inside the home. She eventually punched or kicked Father and was able to escape. She, however, did not report this incident to law enforcement. Mother testified that she "led [Father] on to believe that [they] were still together" because she was afraid of him.

Mother articulated that she separated from Father a few times and returned during their relationship because she did not wish to leave Brooke, Haley, and Jacob alone with Father. She explained that she feared for Haley's safety if left alone with Father. Mother indicated that Father taught the Child to call her "a b****" and curse at her. Mother also testified regarding an incident when Father washed Haley's and Brooke's hair in kerosene because of lice. He ultimately shaved the girls' heads. Father admitted that he used kerosene as a lice treatment but denied pouring kerosene over their heads. Father explained that the kerosene was in a towel that he placed on their heads.

Brooke testified during trial regarding the physical abuse she and her siblings, Jacob and Haley, had experienced. Brooke witnessed Father pushing Haley and Jacob against a wall and hitting each of them with an open hand. She also observed Father pushing Haley to the floor, leaning over her, yelling, and holding her against the wall by her throat. Brooke reported that she had several welts on her body resulting from Father spanking her with a belt. According to Brooke, Father "stomp[ed]" on both her and Haley. Brooke also testified that Father choked her often, at times causing her to "pass out." Brooke indicated that she observed Father choking Haley and Jacob. In response, Father denied ever choking or stomping the children.

Mother related that Father had locked Haley out of the home on two occasions. Father confirmed in his testimony that although he had locked Haley out of the home because she had threatened to run away, Haley could have knocked to gain entrance, which she never did. Mother also testified that Father once locked Haley in her bedroom closet as a form of discipline, leaving her alone in the home. Mother stated that she had observed Father hitting Haley and Jacob with an open hand but never with objects. She also witnessed Father pushing Haley and Jacob against a wall on separate occasions. According to Mother, Father became angry with Haley once, grabbing Haley by the throat. Mother described another incident when Father had knocked Haley to the floor, pinned her down, and leaned over while yelling at her. She stated that Father did not touch Haley during this incident. Mother indicated that she did not observe Father stomping the children. According to Father, he had spanked the children and had previously grabbed Jacob and placed him against a wall by his shirt. Although Father

5

acknowledged that the children may have fallen to the ground when he whipped them, he denied stomping them.

Brooke continued to relate that Father once disciplined Haley and her by driving them to a gas station and leaving them there. According to Brooke, although Father eventually returned and picked them up, he left them there long enough to cause them worry. While Father acknowledged that he transported Haley and Brooke to a gas station, he insisted that he only drove around the building, never leaving the children alone at the establishment.

Brooke also testified at trial regarding sexual abuse perpetrated against her by Father. She related that Father got into the shower with her to wash lice from her hair while both of them were naked. According to Brooke, Father stood behind her in the shower. When she tried to pull away from Father, Father attempted to draw her against him. Brooke indicated feeling uncomfortable while in the shower with Father. She stated that Mother was also present. In response, Father denied ever being in the shower with Brooke and added that "she was old enough to wash her own hair." Mother also denied that Father ever entered the shower with Brooke, stating that she was present in the bathroom the entire time during the lice incident.

Brooke described another incident when Father picked her up from school early and took her home when no one else was present. According to Brooke, Father played a pornographic video in her presence and removed his pants. Father directed her to put a condom on him, which she did. Brooke reported that after Father instructed her to go into the bedroom and remove her clothing, he entered the room. Brooke explained that when Father told her to get on the bed and attempted to have sex with her, his private parts touched her private parts. Brooke reported that when she voiced her refusal, Father told her "that it was normal, that that's what parents and kids do." According to Brooke, although she had previously feared Father, by the time of trial she no longer did because he was incarcerated and she was now in a safe place.

Father denied ever inappropriately touching any of the children. According to Father, Brooke was motivated to voice complaints against him because he maintained a strict home environment. Conversely, Father stated that Brooke desired living with her mother, Latisha H., where she was provided whatever she wanted. Father also suggested that Latisha H. had coerced Brooke into making sexual allegations against Father because Latisha H. purportedly owed a child support arrearage to Father of approximately $46,000.

Two DCS case managers, Alexandra Timberlake and Rebecca Monsue, testified during trial. Neither of them were involved with the case prior to 2014. Ms. Timberlake had been the case manager from some time in 2014 until March 2015. According to Ms.

6

Timberlake, she was unable to contact Father except through his attorney. DCS had previously been relieved of making reasonable efforts to reunify Father with the Child when she was assigned to the case. Ms. Timberlake opined that she would be concerned for the Child if he were to return to Father's home. The current case manager, Ms. Monsue, having been assigned the case in March 2015, explained that the Child had not seen Father in five years. According to Ms. Monsue, inasmuch as the Child was thriving in his foster home, it would be detrimental for him to be removed.

Although Dr. Pestrak had testified during the adjudicatory hearing on October 29, 2012, he was deceased by the time of the termination trial. Accordingly, the trial court permitted a transcript of Dr. Pestrak's prior testimony to be admitted into evidence in the instant case. Dr. Pestrak had evaluated Father after his children were removed from Father's care and had recommended that Father complete mental health counseling or treatment and therapy to address his anger issues. However, Dr. Pestrak had opined that Father was a poor candidate for therapy because Father did not believe he needed counseling.

The Child's foster parent, Darryl H. ("Foster Father"), testified that the Child had been residing in his and his wife's home for approximately four years and four months since first being placed into DCS custody. According to Foster Father, although the Child was rambunctious and disrespectful to the foster family when he initially came into their home, the Child's behaviors had improved. Foster Father indicated that the Child had been in therapy the entire time he had resided with them and that the therapy had helped the Child. Foster Father opined that the Child was doing well in his home, and he expressed a desire to adopt the Child if the Child were to become available for adoption.

Following the October 24, 2016 trial, the trial court granted the termination of Father's parental rights on the statutory grounds that (1) Father had abandoned the Child by engaging in conduct that exhibited a wanton disregard for the Child, (2) Father had committed severe child abuse against a half-sibling of the Child (Brooke), and (3) the conditions that led to the removal of the Child from Father's custody still persisted. The trial court found insufficient evidence to prove that Father abandoned the Child by failing to provide a suitable home upon finding a lack of reasonable efforts by DCS during the four months following removal. Upon analyzing the statutory factors, the trial court determined that it was in the best interest of the Child to terminate Father's parental rights. The trial court also found that grounds for termination existed against Mother but that termination of her parental rights was not in the best interest of the Child. Consequently, the trial court terminated Father's parental rights to the Child but did not terminate Mother's parental rights. Father timely appealed.

7

## II. Issues Presented

Father presents three issues for our review, which we have restated as follows:

1.      Whether the trial court erred by relying on findings of fact and conclusions of law contained in the dependency and neglect adjudicatory hearing order when an appeal thereof was pending.

2.      Whether the trial court erred by terminating Father's parental rights to the Child while not terminating Mother's parental rights to the Child.

3.      Whether the trial court erred by finding that DCS had met its burden of proof to demonstrate grounds, warranting termination of Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and

of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Evidentiary Issues

Father contends that the trial court erred by relying on its previous adjudicatory hearing order from a separate and distinct matter. According to Father, DCS may not

rely on prior court orders from a separate action in a termination trial. It is well settled that a trial court may rely on a prior court order finding severe abuse and is not required to re-litigate the issue of severe abuse at the termination trial. *See State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). However, because the trial court may not rely on a court order that is not final for purposes of *res judicata*, such an order may not be afforded preclusive effect. *See Creech v. Addington*, 281 S.W.3d 363, 377-78 (Tenn. 2009); *In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011). As this Court has explained:

> Importantly, both *res judicata* and collateral estoppel require a final judgment from which to take their preclusive effect. *State v. Thompson,* 285 S.W.3d [840,] 847 [(Tenn. 2009)]; *Richardson v. Tennessee Bd. of Dentistry,* 913 S.W.2d 446, 459 (Tenn. 1995).
>
> * * *
>
> [A] judgment may be considered "final" in order to confer jurisdiction on an appellate court pursuant to Tennessee Rules of Appellate Procedure Rule 3(a), while not being "final" for purposes of *res judicata* because such an appeal is pending.
>
> This is, in fact, the rule in Tennessee, where a "'a judgment is not final and *res judicata* where an appeal is pending.'" *Creech,* 281 S.W.3d 377-78 (quoting *McBurney* [*v. Aldrich*]*,* 816 S.W.2d [30,] 34 [(Tenn. Ct. App. 1991)]); *see also Freeman v. Marco Transp. Co.,* 27 S.W.3d 909, 913 (Tenn. 2000). Our Supreme Court, citing the Restatement (Second) of Judgments § 13 cmt. f, has noted that Tennessee's rule is a minority position and that the predominant view in other jurisdictions is that the "taking of an appeal does not affect the finality of a judgment for *res judicata* purposes." *Creech,* 281 S.W.3d at 378 n.17 (collecting cases from other jurisdictions). However, it is an inescapable conclusion that, in Tennessee, a judgment from a case in which an appeal is pending is not final and cannot be *res judicata* until all appellate remedies have been exhausted.

*In re Shyronne D.H.*, 2011 WL 2651097, at *5-6 (footnotes omitted).

This Court addressed a similar situation in the case of *In re Adriana L.*, No. M2013-00646-COA-R3-PT, 2013 WL 5434629, at *3 (Tenn. Ct. App. Sept. 25, 2013), determining as follows:

10

Mother asserts that the trial court erred in admitting two prior orders that adjudicated the children dependent and neglected and found the children were subjected to severe abuse as exhibits at trial. Mother states that she filed an appeal from those orders which was still pending at the time of the termination hearing. She argues that because the orders were being appealed, they were not final and should not have been admitted or relied on by the trial court. Mother also asserts that the trial court erred in using "the findings and conclusions from those trials instead of making findings based upon the evidence presented at the termination of parental rights trial."

Mother cites *In re Shyronne D.H.* in support of her contentions. *In re Shyronne D.H.,* No. W2011-00328-COA-R3-PT, 2011 WL 2651097 (Tenn. Ct. App. July 7, 2011). In *In re Shyronne D.H.,* the trial court held that a previous finding of severe child abuse from a dependency and neglect proceeding was res judicata and excluded all evidence and argument on the issue of severe abuse at the termination of parental rights hearing. *Id.* at *9. Mother appealed, and this Court determined that the prior order the trial court relied on was not yet a final judgment and that the trial court erred by precluding Mother from asserting her defense. *Id.* at * 10. *In re Shyronne D.H.* is distinguishable from the instant case. Here, the trial court heard testimony from eight witnesses regarding the parties' alleged child abuse and made independent findings that the conduct of the parties constituted severe child abuse. The trial court recognized it could not solely rely on the prior order and did not apply the doctrine of res judicata, nor did it preclude Mother from presenting evidence on the issue of severe abuse. Furthermore, we have carefully reviewed the testimony and exhibits presented at trial and find that the trial court did not adopt the findings of fact and conclusions of law in the prior orders wholesale; rather, the court allowed the parties to fully litigate the issues and made independent findings based on the evidence presented. The introduction of the prior orders is not reversible error.

*In re Adriana L.*, 2013 WL 5434629, at *3 (footnotes omitted).

In this matter, the trial court admitted as an exhibit the previous adjudicatory hearing order wherein the court found that the Child was dependent and neglected and that Father had committed severe abuse against two of the other children. Following the testimony of several witnesses, the trial court entered its order terminating Father's parental rights to the Child. The trial court included in its decision portions of evidence from the previous adjudicatory hearing order presented in the prior trial, including testimony from Jacob and Haley, who did not testify during the termination trial. We

11

determine that the trial court erred insofar as the court relied on the evidence in the adjudicatory hearing order that was not presented at the termination trial. *See In re Adriana L.*, 2013 WL 5434629, at *3.

Such error was harmless, however, because the trial court did not apply *res judicata* or afford the findings in the adjudicatory hearing order preclusive effect. The parties were given the opportunity to re-litigate these issues during the termination trial. In its order, the trial court provided a summary of the evidence presented in the termination trial upon which it had relied in making its decision regarding termination of parental rights. The trial court further stated regarding the severe child abuse finding: "While the Adjudicatory Order was appealed to Circuit Court, this appeal is still pending and this court further finds that the proof introduced herein is sufficient, independent of the Adjudicatory Order, to sustain such finding."

Although the trial court erred by relying on testimony supporting the adjudicatory hearing order that was not presented during the termination trial, we determine this error to be harmless because the trial court did not apply preclusive effect to the adjudicatory hearing order. Instead, the parties were permitted to re-litigate the issues while the trial court conducted its own independent analysis of the evidence presented in this action. Furthermore, the clear and convincing evidence presented to the trial court in the termination trial supports the trial court's ultimate findings concerning the grounds of wanton disregard and severe child abuse, as well as its finding that termination of Father's parental rights was in the best interest of the Child.

V. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

12

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

While Father contends generally that DCS did not meet its burden of proof to terminate his parental rights, he does not proffer a specific ground or the best interest analysis as a predicate for his assertion. In its appellate brief, DCS states that it will not defend the ground of persistence of conditions on appeal. Because the adjudicatory hearing order was on appeal at the time of trial and was therefore not final for purposes of *res judicata*, we reverse the trial court's finding of persistence of conditions as a ground for termination of Father's parental rights. *See In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *8 (Tenn. Ct. App. Nov. 16, 2015) ("[U]ntil the dependency and neglect order has reached its 'final completion,' either because there has been no appeal, or through the exhaustion of all appellate remedies, we hold that the prior order, which is not res judicata, cannot form the basis, standing alone, for termination of parental rights on any ground that contemplates reliance on a previous finding or order.") (citing *Swift v. Campbell,* 159 S.W.3d 565, 573 (Tenn. Ct. App. 2004)). We will examine each remaining ground and the best interest analysis in turn to determine whether clear and convincing evidence supported the trial court's termination of Father's parental rights.

## A. Abandonment through Wanton Disregard

The trial court found that Father abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to Father's incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this issue, provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides in pertinent part:

13

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

(Emphasis added.)

A parent's actions constituting wanton disregard for the welfare of a child are not restricted to only the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d at 871. This Court has consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68; *see also In re K.F.R.T.,* No. E2015-01459-COA-R3-PT, 2016 WL 908926 at *4 (Tenn. Ct. App. Mar. 10, 2016). "Simply stated, a parent's 'poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.'" *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (quoting *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)).

Sexual abuse by a parent can be the basis for a court's finding that a parent has engaged in behavior that constitutes wanton disregard for the child's welfare. *See In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (determining that multiple sexual acts committed by a parent against his or her child, which led to a lengthy prison sentence "without question reflects a wanton disregard for the [c]hild's welfare."). Furthermore, the parent's conduct may constitute a wanton disregard for the welfare of his or her child even though it be directed toward a step-sibling of the children at issue in the termination of parental rights proceeding. *See In re G.M.H.*, No. M2006-02665-COA-R3-PT, 2007 WL 1527003, at *3 (Tenn. Ct. App. May 24, 2007) ("The sexual abuse of Father's stepdaughter, the children's stepsister, is sufficient to exhibit wanton disregard for their welfare.")

Regarding its determination that Father had abandoned the Child by engaging in conduct that exhibited a wanton disregard for the Child's welfare prior to Father's incarceration, the trial court found as follows:

The relevant four month period [prior to the filing of the petition] would be May 1, 2015, until September 1, 2015. Exhibit 5 reveals that Father was incarcerated from April 6, 2015, until May 30, 2015. Therefore, Father was incarcerated during ". . . part of the four (4) months immediately

14

preceding the institution . . ." of this action. Because Father was incarcerated during this period, the court must assess whether the pre-incarceration actions of Father constitute "wanton disregard for the welfare of the child."

\* \* \*

In examining Exhibit 5, the court finds that Father has an extensive incarceration and criminal history. He was charged on 4/6/15 with Rape of a Child, Aggravated Sexual Battery, and Sexual Battery by an Authority Figure, and spent 55 days in jail; he was charged on 12/5/14 with Failure to Appear and spent 55 days in jail; he was charged on 5/10/14 with Domestic Assault and Child Endangerment and spent 2 days in jail; he was charged on 1/13/14 with Rape of a Child and Sexual Battery by an Authority Figure and spent 6 days in jail; he was charged on 3/25/13 with Rape of a Child and Sexual Battery by an Authority Figure and spent 2 days in jail; he was charged on 1/17/13 with Failure to Appear and spent 1 day in jail; he was charged on 8/27/12 with Failure to Appear and spent 1 day in jail; he was charged on 6/2/08 with Failure to Appear and spent 1 day in jail; he was charged on 7/22/05 with Conspiracy to Sell Cocaine Over 5 Grams and Mfg/Del/Sell Controlled Substance (2 counts) and spent 3 days in jail.

The court recognizes that some of these charges may be duplicates or charges regarding the same criminal activity (arrests and subsequent bind overs, for instance), especially with regard to the later sexual charges. Also, the court recognizes that this Exhibit is a compilation of jail records only, and does not reflect the disposition of these charges. Nevertheless, such a history raises significant and troubling issues concerning Father's ability to successfully raise a child. Continued arrests spread over an extended amount of time is concerning, especially when one observes that arrests require a probable cause determination by a neutral and detached magistrate. This is not behavior exhibited by good parents. Certainly, such a history brings to mind "wanton disregard" for the child's welfare, especially when considering that the sexual misconduct charges were for actions against Father's own children, and the domestic violence charge relates to Mother as victim. Such continued arrests give meaning to Justice Koch's observation in *Audrey* [*In re Audrey S.*, 182 S.W.3d at 866] that continual incarceration "compromises a parent's ability to perform his or her parental duties." Indeed, such a notion is "commonsense."

Corroboration of a portion of the charges detailed above is Exhibit 1, Parts 12, 13, and 14. Part 12 is True Bill 2013 CR-34, Stewart County

15

Circuit Court, dated March 18, 2013, in which Father was indicted for Rape of a Child and Sexual Battery by an Authority Figure; Part 12 also contains a [Judgment] dated August 22, 2016, wherein Father was convicted of Child Abuse and Neglect in this matter.

Part 13 is True Bill 2014 CR-51, Stewart County Circuit Court, dated May 19, 2014, wherein Father was indicted (superceding indictment) for Rape of a Child, Sexual Battery by an Authority Figure, and Aggravated Sexual Battery, Under Age 13; Part 13 also contains a [Judgment] dated July 15, 2016, wherein Father was convicted of two counts of Child Abuse and Neglect. The court notes that Parts 12 and 13 appear to be documents relating to the same factual events.

Part 14 is True Bill 2014 CR-121, Stewart County Circuit Court, dated November 17, 2014, wherein Father was indicted for Domestic Assault and Reckless Endangerment. The court understands these charges are still pending.

Part 15 of Exhibit 1 is a Stewart County General Sessions judgment document dated April 12, 2016, wherein Father pled guilty to Driving Without a License (amended from Driving on a Suspended License), with a notation that accompanying Failure to Appear and Speeding charges were nolled in settlement. Also included is a Capias/Bench Warrant for Failure to Appear.

Part 17 of Exhibit 1 is a Petition For Contempt dated December 29, 2014, against Father for failure to pay child support.

The court next considers Exhibit 1, Parts 4, 5, 6, and 7. These documents provide additional corroboration of some of Father's behaviors reflected in the charges and court records detailed above. Part 4 is a Protective Custody Order dated May 21, 2012, in which [the Child] is brought into the court's protective jurisdiction. Part 5 is a Protective Custody Order dated June 26, 2012, in which [the Child] is brought into the court's protective jurisdiction. The court notes that these documents appear to be duplicative and relate to the same factual events.

* * *

Mother testified that Father became "physical" after [the Child] was born. She stated Father "smacked" Haley in the mouth, locked Haley inside her bedroom closet in 2010 and locked her outside the house twice,

16

once requiring Mother to take Haley a jacket because it was cold. Mother said she saw Father "pin" the kids to the floor in a violent manner, saw Father push Haley and Jacob against a wall, saw Father knock Haley to the floor, saw Father hit Jacob with an open hand "a couple of times," and said that this type of discipline would occur "a lot" and "weekly."

Mother testified that Father was abusive to her also, grabbing her by the neck after an argument and forc[ing] her to the floor. Mother stated that Father threatened to "dump her in a well" if she took [the Child] from [him]. Mother stated that Father was verbally abusive also, calling her and the children various names, including "whore," "stupid," "retarded," "b****," "butt-head," and "idiots."

Mother also testified about an incident in July 2014 in which Father pinned her in her car after an argument, smashed her cell phone, followed her in his vehicle and stopped her on the road by "spinning out" in front of her, and took her car keys, forcing her to retreat to a neighbor's house for aid. This led to criminal charges against Father.

Brooke confirmed that life with Father was "crazy," meaning Father's parental methods were overly physical and violent.

The court particularly recalls Brooke's testimony regarding Father's "stompings" and confirmed that Father would use his legs and feet to strike Brooke in a downward motion while Brooke was "curled up" on the floor. The image this brings to mind is heartbreaking.

Brooke testified that Father would choke her to the point of passing out. When asked whether this was a unique occurrence, she stated that this happened "a few times." Brooke also stated that she saw Father choke Haley and she witnessed Father assaulting Mother by choking her. Brooke stated, confirmed by Mother, that she intervened to help Mother by punching Father.

Dr. Pestrak also corroborated Father's violent tendencies in relating an episode that Father told him during Dr. Pestrak's evaluation. This episode concerned events occurring just after Father's sexual abuse had come to the attention of the authorities, with Father seeking retribution against [Latisha H.] for the disclosure:

"Q. And what did [Father] admit to you about that?

17

A.     Well, when asked about that incident, [Father] indicated that he was upset with the children of — the mother of his children, because he believed that she was coaching them to report sexual abuse against him.

Q.     Uh-huh (affirmative)

A.     It made him angry enough that he indicated that he got a gun and was driving to shoot her, and he — he acknowledged that he would have done so except for police intervention.

Q.     Actual police intervention?

A.     Actual police intervention, yes.

Q.     Okay.

A.     The police — he saw a police car coming opposite of him knowing his wife had called, assuming his wife had called, and then he said he threw the gun out of the car, so when he was stopped, there was nothing to get in trouble.

Q.     Okay.

A.     But he said if he had not been stopped, he would have shot her."

Dr. Pestrak's testimony further corroborates Father's violent tendencies:

"A.     [Father] was very clear about indicating he lost his temper at le[a]st one time perhaps twice when he spanked his daughter.  And constant physical abuse, when asked about it, he indicated that was something that would not happen *again* and there was no reason for concern. . . ."

* * *

18

Brooke also testified to an incident wherein Winter fell off the bed and suffered a minor injury. Father blamed Haley and Brooke. Brooke observed Father "stomp" Haley and then he took both girls to a gas station and dropped them off telling Brooke that [Latisha H.] worked there. Brooke said [Latisha H.] did not work there and they were left there for some period of time before being retrieved by Father.

Ms. Timberlake, case manager for [DCS], confirmed that Mother had told her "several times" that she was "terrified" of Father. She further stated that her only concern was for [the Child's] safety should [the Child] have contact with Father. She stated that she did not know if Mother could protect her children from Father. She also stated that Mother received services to enable her to avoid and/or manage domestic violence.

Ms. Monsue, case manager for [DCS] with responsibility for this case since March 2015 until present, confirmed Mother had been provided "services" addressing domestic violence issues. She also stated that she desired Mother to undergo individual counseling due to issues from the "whole case," indicating that Mother has experienced significant trauma from this matter. Ms. Monsue conceded that this counseling, which Mother has not yet begun, was required of Mother after the filing of the Petition herein.

In addition to Father's physical abuse of the children and Mother and violent tendencies, further evidence of "wanton disregard" of the children's welfare can be found in Father's sexual depredations upon Brooke. These allegations led to a portion of the criminal charges detailed above and Father's two convictions for Child Abuse and Neglect (see discussion above).

* * *

Brooke confirmed the sexual encounter incident in which Father checked her out of school early one afternoon. Brooke stated she was age 12. Father took her home and made her watch pornographic films; Father made her put a condom on him and sexually penetrated her on the bed. . . .

From all of the foregoing, the court concludes that [DCS] has met its burden of proof regarding this ground. The proof introduced for this ground satisfies the clear and convincing standard. Father's pre-incarceration actions clearly evidence a "broader pattern of conduct that renders [Father] unfit or poses a risk of substantial harm to the welfare of

19

the child." (quoting Justice Koch above [*In re Audrey S.*, 182 S.W.3d at 866]).[3]

(Internal citations to record omitted.)

Upon careful review, we agree with the trial court. It is undisputed that Father was incarcerated during part of the four months preceding the filing of the termination of parental rights petition. DCS presented testimony at trial by Mother and Brooke that Father had physically assaulted Mother, Brooke, Haley, and Jacob. It is undisputed that Father had not physically harmed the Child. Mother testified and Brooke's testimony confirmed that Father had grabbed Mother by the throat on one occasion and pushed her to the ground. This incident happened in the presence of Brooke and Haley. Brooke and Mother testified that Brooke tried to intervene to assist Mother. At trial, Father admitted to putting his hands around Mother's neck but denied choking her. He indicated that it only lasted for "a split second."

Brooke and Mother both testified regarding Father's abuse of the children. Brooke related that Father choked her on one occasion and caused her to pass out. According to Brooke, Father had "stomp[ed]" Brooke, Haley and Jacob on several occasions. Mother testified that Father had locked Haley in her closet, leaving Haley home alone as punishment. Mother further indicated that Father had hit the children with an open hand. Father denied ever stomping or choking the children.

Brooke also testified to sexual abuse perpetrated against her by Father. At the time of trial, Father was incarcerated on two charges of child abuse that involved Brooke as the victim. According to Father, he was sentenced to eleven months and twenty-nine days on each charge to run consecutively.

Despite Father's denial of the physical and sexual abuse, the trial court found that Father had abandoned the Child by exhibiting a wanton disregard for the Child based on the testimony of Mother, the testimony of Brooke, and several exhibits regarding his criminal charges. Based on the trial court's findings, we can infer that the trial court determined Brooke and Mother's testimony on this issue to be more credible than Father's testimony. *See In re Sidney J.*, 313 S.W.3d 772, 777 (Tenn. 2010) ("We may infer the trial court's findings on issues of credibility and weight of testimony from the manner in which the trial court resolved conflicts in the testimony and decided the case."). Although no evidence was presented that the Child was physically or sexually

---

[3] We have omitted the trial court's recitation of certain facts found in the adjudicatory order because we have concluded that the trial court erred in including those facts in its order regarding the termination of parental rights proceeding inasmuch as the adjudicatory order was not final for purposes of *res judicata* due to the pending appeal.

abused by Father, the evidence supports the trial court's determinations that Father physically abused Mother, Brooke, Haley, and Jacob and that Father sexually abused Brooke. This Court has previously concluded that a parent's sexual abuse against a step-sibling is sufficient to support a finding of wanton disregard. *See In re G.M.H.*, 2007 WL 1527003, at *3.

Additionally, Mother testified concerning an incident when Father had left the home with a gun and headed for Latisha H.'s home. Father admitted that he had planned to "blow her head off." Father's statements to Dr. Pestrak included that he would have shot Latisha H. except for police intervention. However, Father continued to deny that he had a problem to be addressed in therapy.

Upon a thorough review of the record and excluding any reference to the findings contained only in the adjudicatory hearing order, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father abandoned the Child in that his actions prior to incarceration constituted a wanton disregard for the Child's welfare. Therefore, the trial court did not err by terminating Father's parental rights based on this statutory ground.

### B. Severe Child Abuse

The trial court also found that Father had severely abused a half-sibling of the Child, Brooke. A court may terminate the parental rights of a parent if he or she has committed severe child abuse against the child at issue or a half-sibling of such child. *See* Tenn. Code Ann. § 36-1-113(g)(4). Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this action, provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> * * *
>
> (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse <u>against the child who is the subject of the petition or against any sibling or half-sibling of such</u>

21

<u>child</u>, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

(Emphasis added.) Tennessee Code Annotated § 37-1-102(b)(21) (2015) defines "severe child abuse," in relevant part, as:[4]

(C)     The commission of any act towards the child prohibited by § 39-13-309, §§ 39-13-502 – 39-13-504, § 39-13-515, § 39-13-522, § 39-15-302, § 39-15-402, or § 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child[.]

Tennessee Code Annotated § 39-13-503 (2014) provides in relevant part:

(a)     Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:

(1)     Force or coercion is used to accomplish the act; [or]

(2)     The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]

Tennessee Code Annotated § 39-15-302 (2014) further provides in pertinent part:

(a)     A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy:

(1)     The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child[.]

A judicial finding of severe child abuse has several statutory consequences to a parent. This Court has elucidated those consequences as follows:

---

[4] Effective July 1, 2016, the General Assembly amended this section, modifying Tennessee Code Annotated § 37-1-102(b)(21) to Tennessee Code Annotated § 37-1-102(b)(22). *See* 2016 Pub. Acts Ch. 979 § 5 (S.B. 2121). We will cite to the version in effect at the time the petition was filed in September 2015.

22

A finding of severe abuse triggers other statutory provisions, including a prohibition on returning the child to the home of any person who engaged in or knowingly permitted the abuse absent consideration of various reports and recommendations. Tenn. Code Ann. § 37-1-130(c). Even with such consideration,

> No child who has been found to be a victim of severe child abuse shall be returned to such custody at any time unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.

Tenn. Code Ann. § 37-1-130(d). Further, Tenn. Code Ann. § 37-1-130(g)(4)(A) provides that reasonable efforts to reunify a family are not required to be made if a court has determined that a parent has subjected the child or a sibling to severe child [abuse].

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court.")[.] The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d at 201 (quoting *Dep't of Children's Servs. v. M.S. & J.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

In its final judgment, the trial court made the following specific findings of fact regarding the statutory ground of severe child abuse:

> The court also finds that Brooke's testimony in this hearing is sufficient proof to conclude that Brooke is a victim of severe abuse at the hands of Father. Her testimony, as discussed under Ground 3 [wanton disregard] above, was clear and convincing that Father engaged in unlawful sexual penetration of Brooke accompanied by coercion, and/or without her consent, and that Father had reason to know that she did not consent.

> The court further finds that Brooke is a "sibling or half-sibling" to [the Child].

23

Accordingly, [DCS] has met its burden of proof under this ground as to Father.

\* \* \*

Father was found by this court to have committed severe abuse on [the Child's] siblings or half-siblings, who were living in the home with [the Child]. While the Adjudicatory Order was appealed to Circuit Court, this appeal is still pending and this court further finds that the proof introduced herein is sufficient, independent of the Adjudicatory Order, to sustain such finding.[5]

(Internal citations omitted.)

Upon careful review of the record, we agree with the trial court. It is undisputed that Brooke E. is a half-sibling of the Child. Brooke testified regarding the sexual abuse perpetrated against her by Father while she was in his custody. Brooke related that while alone in the home with Father, he made her watch a pornographic video, put a condom on him, and take off her clothing. Brooke reported that Father's private parts touched her private parts. According to Brooke, when she expressed to Father that she did not wish to participate, he stated to her "that it was normal, that that's what parents and kids do."

Father denied the allegations that he had sexually abused Brooke, insisting that she lied because she wanted to live with her mother, Latisha H. Despite Father's denial, clearly the trial court found Brooke's testimony on this issue to be more credible than Father's based on the trial court's resolution of the conflicts in testimony. *See In re Sidney J.*, 313 S.W.3d 772, 777 (Tenn. 2010) ("We may infer the trial court's findings on issues of credibility and weight of testimony from the manner in which the trial court resolved conflicts in the testimony and decided the case."). Furthermore, Father testified that he proceeded to trial on criminal charges of rape of a child and sexual battery by an authority figure as to Brooke. Consequently, Father was convicted of two counts of child abuse and neglect.

Upon a thorough review of the record and excluding any reference to the facts contained only in the adjudicatory hearing order, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence,

---

[5] We have again omitted the trial court's recitation of certain facts found in the adjudicatory order because we have concluded that the trial court erred in including those facts in its order regarding the termination of parental rights proceeding.

24

that Father severely abused Brooke, a half-sibling of the Child. Therefore, the trial court did not err by terminating Father's parental rights based on this statutory ground.

## VI. Best Interest of the Child

In addition to generally arguing that DCS failed to meet its burden of proof to terminate Father's parental rights, Father contends that the trial court erred by terminating only his parental rights and not terminating Mother's parental rights. According to Father, error lay in the termination of only his parental rights because there is no possibility of an adoptive Father. Father ostensibly argues that because an adoption is not imminent, termination of his rights is prohibited. When termination of both parents' rights is sought by a petitioner with the intent of adoption, there is no statutory bar that prohibits the trial court from terminating one parent's parental rights while denying termination of the other parent's parental rights. *See* Tenn. Code Ann. § 36-1-113. However, whether only one parent's parental rights should be terminated may be an appropriate consideration in the best interest analysis. *See, e.g., In re Liam S.*, No. E2016-02461-COA-R3-CV, 2017 WL 4422342, at *11 (Tenn. Ct. App. Oct. 4, 2017); *In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *8 (Tenn. Ct. App. July 9, 2008).

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 (Tenn. 2016) ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1)     Whether the parent or guardian has made such an adjustment
>           of circumstance, conduct, or conditions as to make it safe and

in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest [s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing

27

more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, ____ S.W.3d ____, No. E2016-00139-SC-R11-PT, 2017 WL 4324959, at *15 (Tenn. Sept. 29, 2017).

In its final judgment, the trial court provided the following findings of fact regarding the best interest analysis:

Factor One.  The court concludes that Father has not made an adjustment of circumstance, conduct or conditions as to make it safe for [the Child] to be returned home.  Father is in jail for child abuse against his own children.  This court found, and so finds today, that Father committed severe abuse against [the Child's] siblings or half-siblings.  Father continues to run afoul of the law, to wit:  there are pending domestic abuse charges against Father with regard to Mother.  No proof was introduced that tended to show that Father has changed any of the conditions that have led us to this point.  He does not take responsibility for his actions; he has expressed no remorse for his actions; he has not completed any type of mental health counseling or parenting counseling (Dr. Pestrak testified convincingly that Father is a poor candidate for counseling, in that Father does not feel that anything is wrong or in need of counseling to repair); he has not addressed his anger issues; he has a tendency, displayed strikingly at this hearing, to minimize his actions and the consequences of his actions; he has not prepared a home for the return of [the Child]; he is divorced from [the Child's] mother and there is not any type of parenting plan or arrangement regarding the care, custody or control of [the Child] should Father regain custody; his posture at this hearing was one of supporting the return of [the Child] to Mother rather than return to him.

Factor Two.  Father has completely failed to effect any type of lasting adjustment after reasonable efforts by [DCS].  As detailed above, Father has failed to complete any type of mental health counseling or parenting counseling.  He has not addressed his significant anger issues.  Although proof of [DCS's] efforts are spare, Exhibit 2 makes it clear that [DCS] arranged for a psychosexual evaluation of Father soon after this matter arose.  The results of the evaluation point out the need for mental health counseling or treatment and therapy to address anger issues.  Although the evaluation seems to cast doubt upon the eventual success of Father's therapy, the court finds that Father did not complete, perhaps even start, any therapy to address any of his needs.  Ms. Timberlake testified that

28

contact with Father was difficult at best, perhaps non-existent save for letters sent to Father's attorney. She testified that Father accepted no services offered. While Ms. Monsue did not address her interactions with Father, the court would note that she was assigned the case in March 2015, well after [the Child] was removed.

Factor 3. There was no proof that Father has visited with [the Child] since he came into custody. There is a no contact order still in place preventing contact. Accordingly, this factor must not sway against Father. The court would note, however, that Father made no attempt to address the underlying issues preventing contact.

Factor 4. There was no proof regarding a meaningful relationship between Father and [the Child]. Because [the Child] was removed from Mother's custody several years ago, Father has not maintained any type of relationship with [the Child].

Factor 5. There was no additional proof introduced regarding how [the Child] might be affected if his caretakers were changed. However, a change from the foster family to Father would be detrimental to [the Child] for the reasons outlined above. Father is not ready for [the Child] and has not addressed, at all, any of the issues which led to the state's intervention in his life. Further, a change from the foster family to any new caregiver would be likely to negatively affect [the Child]. [The Child] has been living with the same resource family since he was removed. The resource father testified that he was "1000%" in favor of adopting [the Child]. Ms. Monsue testified that [the Child] was happy in his placement and indicated that [the Child] wished to continue to live there. Obviously, a change in caretakers would have some effect on [the Child], presumably negative.

Factor 6. Father was found by this court to have committed severe abuse on [the Child's] siblings or half-siblings, who were living in the home with [the Child]. While the Adjudicatory Order was appealed to Circuit Court, this appeal is still pending and this court further finds that the proof introduced herein is sufficient, independent of the Adjudicatory Order, to sustain such finding.

Factor 7. There was no proof offered as to Father's present home or whether such home would be a safe and stable home. From the entirety of the proof, the court would conclude that Father has not provided such a home. He is currently in jail and has not had custody of his children for

29

several years. Further, Father continues to engage in activities that attract the attention of the police, to wit: pending domestic violence charges.

Factor 8. The court is concerned about Father's mental and/or emotional state. The court finds that such would present a clear danger to [the Child's] well being and Father would not be able to provide safe and stable care and supervision to [the Child]. Dr. Pestrak's evaluation and his testimony during the Adjudicatory Hearing contain cautionary language in regard to Father's mental state. Dr. Pestrak testified that Father has narcissistic traits, tends to minimize his own behavior, is not a fit subject for counseling, has anger issues (recall Dr. Pestrak's harrowing recounting of Father arming himself with a shotgun to kill [Latisha H.]), has difficulty in being empathic to others, puts his own needs before others, has difficulty in recognizing needs of others, and has "significant characterological problems, which are largely going to be manifested by inappropriate expression of anger . . . ." To say the least, these are traits not associated with successful parenting. Father's psychosexual evaluation also points out concerning mental issues of Father. Dr. Pestrak states that Father "engaged in some efforts to slant his responses in an overly positive manner", has a "clear tendency to minimize and deny negative personal traits and mistakes", is "less than willing to face his negative emotions and personal issues", he tends to "deny them while externalizing blame and engaging in some distorted reasoning as a feeble defense", and concludes by stating that "any return of the children to [Father's] care be coordinated with evidence of progress in his ability to process significant anger when it arises." These are significant conclusions by a seasoned mental health professional.

Factor 9. There was no proof showing that Father has failed to pay child support. All proof showed he has made regular payments as required.

Accordingly, considering the totality of the foregoing, the court concludes that it is in [the Child's] best interests for Father's parental rights to be terminated.

(Internal citations to record omitted.)

The trial court considered a number of factors as listed above in its findings of fact and conclusions of law. The trial court found that Father had severely abused Brooke, a half-sibling of the Child. Both Mother and Brooke testified to extensive physical abuse by Father toward Mother, Brooke, Haley, and Jacob. Based on the evidence presented, no meaningful relationship existed between Father and the Child. We note that a no-contact order has prohibited contact between Father and the Child.

Based on the record, there is no reasonable expectation that reunification with Father would occur in the near future. Father was incarcerated at the time of trial on two convictions of child abuse against Brooke. Father continued to deny responsibility for the abuse and failed to admit that he had an anger problem, which, according to Dr. Pestrak, made it unlikely that Father would succeed in therapy in addressing his issues. Foster Father's testimony demonstrated that the Child was doing well in his home and that the foster parents wished to adopt the Child should the Child become available for adoption.

We note that, as the sole best interest factor weighing in favor of preserving Father's parental rights, the Child's loss of a right to future child support from Father may be a proper consideration in some cases. *In re Audrey S.*, 182 S.W.3d at 879-80 ("In some cases, the child's loss of a legally enforceable right to future support from a parent is an appropriate consideration in deciding whether termination is in the child's best interests."). However, the factor is not relevant in every case. *See id.* The Court in *Audrey S.* recognized that no court order existed to prevent the parent from providing future support for the child and that the parent had a consistent pattern of failing to pay child support. *See id.* This Court ultimately determined that termination was in the Child's best interest and that "refusing to terminate [the parent's] parental rights in the name of protecting an abstract legal right of [the children] to receive future monetary support from [the parent] would do nothing to advance the best interests of these children." *See id.*

In the present matter, Father testified that he does provide child support for the Child. It is unclear from the record whether the Child received social security benefits as a result of Father's disability or whether Father's disability benefits were garnished and sent directly to the state for child support while the Child remained in foster care. Father has made no argument regarding child support or whether such support would cease if his rights were terminated. We note, as in *In re Audrey S.*, 182 S.W.3d at 879-80, that there is no court order that would prevent Father from continuing to provide monetary support for the Child. The trial court considered that DCS had not proven that Father failed to pay support for the Child but determined that when considering the applicable factors, it was in the best interest of the Child for Father's parental rights to be terminated. Upon a thorough review of the record and considering all the statutory factors regarding best interest, we determine that the evidence does not preponderate against the trial court's finding, upon a clear and convincing standard, that termination of Father's parental rights to the Child was in the Child's best interest.

31

## VII. Conclusion

We reverse the trial court's finding of clear and convincing evidence of the statutory ground of persistence of conditions. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Child. Costs on appeal are assessed equally to the appellant, Toby E., and the appellee, Tennessee Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE